**PACIFIC TECHNICA CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 424–81C.

United States Claims Court.

Dec. 22, 1986.

See also 2 Cl.Ct. 170.

394

James V. Ryan, William H. Mulligan, Jr., James L. Karl, II, Patrick J. Walsh, New York City, for plaintiff.

James D. Stokes, Jr., Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, for defendant; Herbert Berl and Jeffry Nelson, Dept. of Justice, Melvin J. Sliwka, Dept. of the Navy, of counsel.

## OPINION

MOODY R. TIDWELL, III, Judge:

This is a patent case which comes before this court pursuant to 28 U.S.C. § 1498 (1982).[1] Plaintiff, Pacific Technica, a California Corporation, contends that it is entitled to compensation for past, present and future unlicensed use or manufacture by defendant of three patented inventions assigned to plaintiff. Defendant asserts that the patents are invalid or unenforceable.

The inventions at issue are disclosed in the following U.S. Patent Nos.: 3,714,900 (sabot patent) entitled "Discarding Sabot Projectiles" issued February 6, 1973, on an application filed August 29, 1969; 3,786,760 (band patent) entitled "Rotating Band For Projectiles" issued January 22, 1974, on an application filed June 1, 1972; and 3,847,082 (slot patent) entitled "Spin Stabilized Discarding Sabot Projectile" issued November 12, 1974, on an application filed August 8, 1972. The slot patent is a division of the sabot patent.

The trial proceedings were limited to the issue of liability with the issue of damages being deferred until after the court's final determination on liability. This action is not barred by the pertinent statute of limitations, 22 U.S.C. § 2356 (1982), because defendant admits procurement of the allegedly infringing devices within six years immediately preceding the commencement of this action.

## FACTS

Thomsom-Ramo-Woolridge, Inc. (TRW), and Oerlikon-Burhle (Oerlikon), a Swiss armament company, worked together in competition for selection as the contractor of the United States Army's Vehicle Rapid Fire Weapons System (VRFWS). The VRFWS contract was two-fold. First, it called for the development and production of ammunition for a previously selected 20 millimeter (mm) gun manufactured by Hispano-Suiza (Hispano), another Swiss company, for the Interim System. Second, it sought the similar development and production of the 25mm Successor or Bushmaster System.

In the early 1960's, plaintiff, under the direction of Mr. Fritz K. Feldmann, began experimenting with depleted uranium (dU),[2] for use as high velocity armor-piercing projectiles. Consequently, in approximately June of 1966, TRW asked Mr. Feldmann to develop a subcaliber dU penetrator for Oerlikon's spin-stabilized discarding sabot projectile.[3] Only Hispano and Oerlikon had

---

1. Section 1498 states in pertinent part as follows:

 (a) Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Claims Court for the recovery of his reasonable and entire compensation for such use and manufacture.

2. dU is a high-density material which is a by-product of the manufacture of nuclear devices and is slightly radioactive. Although dU requires careful handling, it is desirable for use in armor-piercing ammunition because it is almost three times as dense as steel and is highly pyrophoric. Being pyrophoric, dU ignites spontaneously when it impacts/penetrates the target, fragments, and burns at temperatures up to approximately 5,000°F. Pyrophorocity gives it behind armor effectiveness.

3. A spin-stabilized sabot projectile is a ballistic comprised of a subcaliber penetrator and a sa-

developed spin-stabilized sabot projectiles for small caliber weaponry. Mr. Feldmann was able to design a successful penetrator for a 25mm spin-stabilized sabot. However, sabot accuracy and reliability were not refined.

In December, 1966, Colonel Patrick H. Lynch, then Project Manager for the Army VRFWS, asked Mr. Feldmann to consider developing a dU penetrator for the 20mm Hispano 820 to be used in the VRFWS. Colonel Lynch requested Mr. Feldmann to submit a proposal for a cost plus fixed-fee development contract to explore the development of an armor-piercing projectile for the Interim System. Mr. Feldmann continued his accuracy and reliability research of both spin-stabilized and fin-stabilized discarding sabots.

Recognizing the propellant and shock wave forces of rifle firing, Mr. Feldmann sought to optimize sabot separation to avoid interfering with the flight of the penetrator. Mr. Feldmann attempted to acquire research funding from Hispano but was unsuccessful. However, Hispano did agree to supply plaintiff with a Hispano spin-stabilized sabot. In March 1967, Mr. Feldmann submitted plaintiff's proposal as requested by Colonel Lynch for development of the spin-stabilized sabot and fin-stabilized sabot.

Between April and June, 1967, plaintiff's engineering staff developed a series of drawings of various sabot designs for the spin-stabilized sabot. The final design is represented by drawing no. 0260–A dated June 14, 1967 (260–A). This drawing was plaintiff's conception of a spin-stabilized sabot. The 260–A had two configurations. One was a full-length sabot that covered the entire penetrator. The other was a test sabot that left the tip of the penetrator exposed. Prior to August 22, 1967, Mr. Feldmann test-fired both sabots represented by the configurations.

During August 22–24, 1967, Colonel Lynch sponsored a security classified conference at Frankford Arsenal, a munitions command installation for the VRFWS research in Philadelphia, Pennsylvania. Mr. Feldmann addressed the conference and described a claimed novel umbrella-type opening of plaintiff's sabot petals. Again plaintiff sought funding support from Hispano but was once again unsuccessful because Hispano did not want to help develop VRFWS's fin-stabilized sabot.

On November 9, 1967, the United States Army issued Contract No. DAAG07–68–C–0320 (projectile contract) to plaintiff for the development and testing of a high density alloy armor-piercing projectile to be used in the Hispano 20mm gun. This research and development was to support continuing work with the dU material so the Army could commence full-scale engineering development and production of dU ammunition for the VRFWS.

The foregoing occurrences and the work under the projectile contract are the focus of this court's analysis regarding plaintiff's claimed conception and reduction to practice of the sabot patent and defendant's defense of title and/or license to use or procure devices containing the sabot patent art.

Sometime before December 12, 1970, plaintiff sought to develop a better band for use on its spin-stabilized sabot in an effort to compete for the Bushmaster contract. On November 16, 1970, General Dynamics requested that plaintiff submit a firm fixed-price proposal to develop an optimized penetrator as delineated in General Dynamics Technical Memorandum No. 6–110–168. On December 9, 1970, plaintiff submitted its proposal, TP–118–70, dated December, 1970, offering to conduct the entire program. Plaintiff's proposal, TP–118–70, was revised on or about January 9, 1971.

---

bot. The sabot protects, aligns, and encases the penetrator during its travel through the barrel of a gun. Upon exit from the barrel, the sabot is shed or stripped from around the penetrator, and the penetrator is permitted to continue its flight unhindered by the sabot. The penetrator's flight is stabilized by spinning at high revolutions per minute.

The Navy issued Naval Ordnance Systems Command Contract No. N00017–71–C–4206 (penetrator contract) to General Dynamics on December 12, 1970. The penetrator contract called for the development of the Phalanx Close In Weapon System (Phalanx) to determine the optimum round for the M61 gun used in Phalanx and an armor piercing projectile. Under the penetrator contract, General Dynamics issued Purchase Order 210825–PB, dated January 25, 1971, to plaintiff to perform the work outlined in plaintiff's proposal, TP–118–70. Irrespective of questions of validity of the patents, defendant contends that it has title or license to the sabot, band, and slot patents because these patents were developed during the course of the projectile and penetrator contracts. Plaintiff maintains that it has the exclusive patent rights to the sabot, band, and slot patents because they were developed independent of the projectile and penetrator contracts with the defendant.

## I. Background on Basic Sabot Operation

A discarding sabot involves the trajectory of a projectile that is smaller in diameter than the barrel from which it is launched. A subcaliber projectile, called a penetrator, is designed to penetrate enemy armor casing. The penetrator is generally cylindrically shaped having one flat end and one conical or pointed end. Since trajectory is initiated in the barrel of a gun or rifle, the subcaliber penetrator must be launched through, remain aligned in, and, if necessary, receive rifling spin from the barrel to insure flight distance and accuracy. The penetrator is encased in a full-caliber sabot with a sabot body and a sabot base, both of which are discarded after the projectile emerges from the barrel. The sabot body surrounds the penetrator much like a glove surrounds a finger. The inside of the sabot body is contoured to fix the alignment of the penetrator within. The sabot outerbody is full-caliber, thus aligning itself

within the barrel. The exposed flat end of the penetrator is then seated into a sabot base and the base and the body are secured together by appropriate means. The base is acted upon by the projectile's propellant cartridge and transmits acceleration to the penetrator.

When a round is fired, the propellant contained in the cartridge is ignited and forces the projectile portion of the round away from the propellant cartridge and up the barrel at approximately 4,000 feet per second. The obturating band[4] on the sabot base engages the barrel rifling causing the projectile to spin at approximately 2,200 revolutions per second. Centrifugal forces acting on the projectile increase as the projectile proceeds up the barrel and the forces act on the sabot body at right angles to the axis of the projectile trajectory. The bore of the gun restrains the explosive outward forces acting on the sabot body.

As the projectile proceeds up the barrel, it pushes the air in front of it forward at a speed of approximately 3–4 mach. As the projectile emerges from the muzzle, this supersonic flow of air causes a precursor shock wave to be formed in front of the emerging projectile which temporarily shields the projectile from the resultant forces of the ambient air. As the projectile emerges from the muzzle, the only forces acting on it are the centrifugal forces and the force of the propelling gases. Within milliseconds after the sabot exits from the barrel, the sabot petal segments are blown open under the influence of these centrifugal and gaseous forces. The segments or petals making up the sabot body are typically predesignated by the use of weak zones in the body design that direct the centrifugal forces on points which will experience maximum strain or tension.

After the obturating band is clear of the muzzle, the propellant gases exhausting from the gun rush forward at a higher

---

**4.** An obturating band, frequently referred to in this Opinion as a "band," has basically two functions. First, much like rings on a piston, the band seals propelling gases to the rear of the projectile in order to maximize the round's propellant forces. Second, the band generates spin by engaging the barrel rifling as the projectile proceeds up the barrel during launch.

velocity than the projectile base. The gases rapidly overtake the projectile and cause a reverse gas flow. Still within the protection of the precursor shock wave, the sabot components experience forces from the rear only as the propelling gases overtake the exited projectile and the precursor shock wave and dissipate into the ambient air. After the projectile exits through the precursor shock wave, aerodynamic drag forces of the ambient air act on the projectile aiding in the separation of the sabot base from the now exposed penetrator. The lone penetrator continues in flight toward its target.

## II. *Components of the Sabot Patent*

The major components of an embodiment of the sabot patent projectile include the sabot base 10 (see Figure 1 below) made of light metal such as aluminum, a circular metal or plastic ring 12 extending circumferentially around a portion of the sabot base 10, a sabot body 14 preferably formed from plastic, and a subcaliber core 16 (see Figure 2) desirably formed of a heavy dense metal. The sabot base 10 preferably includes a forward member providing a seat for the base of the core 16. The sabot body 14 is composed of a cylindrical body threaded to a tapering nose shield 24. The body comprises a plurality of wall segments 22 which are separated by longitudinal slots 28 extending forward from the rear end of body over most of its entire length but terminating short of the forward most portion of the body. Slots 28, which extend through the entire thickness of body, provide weakened lines of separation of the body walls so that, under the influence of outwardly directed radial forces, the body wall will automatically split into the segment 22. Further, slots 28 terminate at a forward point so that the unweakened forward portion of body will offer greater resistance to fracture under radial stresses than the rearward body portions. The rear end of body is reduced slightly in diameter to receive a thin retaining ring 44 which locks the aft ends of segments 22 into place to prevent their separation during handling and loading of the projectile.

Figure 1

At the instant of firing, the projectile's obturating band 12 engages the rifling in the gun barrel to prevent by-pass of the propellant gases and to impart spin to the sabot base during its travel through the barrel. The spin of the base is transferred to the other sabot components as well as to the subcaliber core 16.

As the projectile accelerates through the length of the barrel, the spin imparted creates centrifugal forces which tend to move wall segments 22 radially outward but which are resisted by the surrounding walls of the barrel. Upon exit of the sabot body from the barrel, as shown in Figure 2 below, the rearward portions of segments 22 offer the least resistance to centrifugal force and tend to move outward radially, exerting great tensile force on the band or ring 44 which then ruptures to initiate separation of the sabot body components by the outward flexing of the aft portions of segments 22 while their forward ends are still restrained by the unslotted portion of body. As the sabot base 10 continues to move forward and clears the muzzle exit, the high pressure gases within the barrel are released to the atmosphere and acceler-

ate to overtake the projectile and impinge on the aft ends of the partially separated segments 22. This gas impingement force augments the centrifugal force and assists in the further separation of the sabot body components so that the combined forces cause fracture of the forward unslotted portion from the sabot body in a cantilever action to discard the wall segments 22 in a radial direction. Nose 24 is likewise fractured into segments defined by grooves 46 therein. Following separation of the sabot body, aerodynamic drag forces cause base 10 to rapidly decelerate and permits the subcaliber core to proceed along the line of fire to the target with a minimum of velocity decay and dispersion.

Figure 2

A second embodiment of the sabot patent is illustrated in Figure 3 below. It shows wall segments 52 of the sabot body 14 having interfitting serrated interfaces 54 instead of the straight longitudinal slots 28 of Figure 1. These longitudinally extending serrated interfaces 54 permit separation of the sabot body wall segments in the manner described for the first embodiment, but the serrations also permit the transmission of shear forces between the segments 52 to increase structural rigidity for firing in automatic guns.

Figure 3

A third embodiment of the sabot patent, is shown in Figures 4–6. The major components of this embodiment include the sabot base 10 made also of light metal such as aluminum, a rotating band 12 extending circumferentially about the base, a sabot body 14 formed of plastic, and a subcaliber core or penetrator 16 formed of a heavy, dense metal. The sabot body 14 is integrally formed and is secured to the base by suitable means. The sabot body is provided with longitudinal cuts or grooves (not extending through the entire thickness of the body) forming weakening lines or webbing which upon rupture divide the sabot body wall into substantially symmetrical segments or petals 62. The longitudinal cuts or grooves 64 are formed so that the effective body wall is allegedly weakest at the aft end and is strongest and least sus-

ceptible to rupture at the forwardmost end
of tip of the continuous sabot body.

Figure 4

Figure 5

Figure 6

In summary, the sabot patent claims that
separation of the sabot body into petals
under centrifugal forces of spin will initiate
sabot separation at the rear of the sabot
body and progress toward the front. The
specifications indicate that the sabot body
positions the subcaliber penetrator in sub-
stantially co-axial alignment with the barrel
axis which is essential for accuracy. This
co-axial alignment is provided by the interi-
or fitting of the penetrator 16 into the
sabot body 14 as well as the concentric fit
of the bourrelet portion of the sabot body
with the gun barrel. Sabot rupture and
separation are claimed to occur in this nov-
el manner in all embodiments.

### III. Components of the Band Patent

A device entailing the band patent art
comprises a projectile base 10 whose bour-
relet section has a recessed, circumferen-
tially extending groove 18 for receiving a
rotating band 12 (see Figure 7 below). The
groove 18 includes a generally channel
cross section extending circumferentially
around the projectile defining a generally
cylindrical base 26 and upstanding shoul-
ders 28 and 30 (see Figure 8 below). Each
side inclines at approximately 30 degrees
measured from the vertical. The base of
the cross section and the inclined sides
meet at dovetailed corners 32 and 34. The
cylindrical base 26 of the groove is smooth-
er over the aft section 26a, covering ap-
proximately one half of the entire smooth
base 26. Ahead of the smooth section 26a
is a knurled surface 26b followed by anoth-
er smoother but shorter surface 26c.

Figure 7

Figure 8

The cylindrical section 12 of the exterior of the rotating band protrudes beyond the diameter of the projectile body to fully and completely engage the rifling grooves of the gun barrel. By expanding into the rifling grooves of the barrel, the ductile plastic band obturates or dams the high pressure powder gases behind it.

When injection molding is employed the knurled section 26b does not, in itself, form an adequate gas seal, therefore, the knurled section has to be backed up by a gas seal 26a. Postmolding shrinkage of plastic is designed to cause a tightening of the plastic around the projectile.

The inclined sides 28 and 30 and the dovetailed corners 32 and 34 of the groove 18 prevent undue expansion of the band under the centrifugal forces resulting from over 2000 revolutions per minute upon launch.

### IV. *Components of the Slot Patent*

The invention of the slot patent may be used in the projectiles set forth in the sabot patent and the band patent and is a division of the sabot patent. The slot patent comprises the sabot configurations of the sabot patent and offers a slot 35 in the base of the subcaliber core 16 as the claimed invention (see Figure 9). Since the subcaliber core 16 is preferably manufactured of a harder metal than the sabot base 32, upon the discharge of the rounds propellant cartridge the harder core base is pressed into the softer seat 34 of the forward portion of the sabot base 32. In this way, the seat 34 is engraved into the slot 35 by set back

forces. The sharp edges of the slot 35 augment the engraving of the sabot seat 34. This insures that the spin of the sabot base will be transmitted to the penetrator without undue slip between the surface of the core seat 34 and the base of the core.

Figure 9

### V. *Alleged Infringing Devices and Defenses*

Plaintiff contends that prior to the sabot patent, all conventional and state-of-the-art discarding sabots operated in such a manner that undesirable yaw and dispersion[5] significantly disturbed the flight of the penetrator. Plaintiff claims that conventional sabots passed through the protective precursor shock wave before discarding the sabot petals, therefore not optimally utilizing the reverse gas flow conditions to aid in petal separation. Thus, sabot separation was delayed, which caused projectile yaw and dispersion.

Plaintiff asserts that conventional sabot bodies, upon exit from the muzzle, fractured first at the front of the sabot. Then, the sabot petals fractured radially from front to rear as the result of centrifugal and aerodynamic drag forces and separated or slid from the penetrator. Plaintiff maintains that this occurred principally outside

5. Yaw is the deviation during flight of the penetrator's axis from the axis of its flight direction. Dispersion is the deviation of the penetrator's trajectory from the desired direction necessary to defeat the target.

the protection of the precursor shock wave and caused yaw and dispersion.

Plaintiff contends that the novel feature of the sabot patent is that the sabot body fractures first at its aft most portion immediately upon exit from the muzzle while the sabot is still in the protection of the precursor shock wave. This is made possible by engineering the aft most webbing of the sabot petals as the weakest zones of the sabot body, hence, most sensitive to the influence of centrifugal forces alone. Thereafter, according to plaintiff, the sabot petals open radially at the rear first, and the impinging propellant gases which overtake the emerged projectile augment the radial petal separation before the sabot exits the protective precursor shock wave. Plaintiff claims that this operation minimizes yaw and dispersion.

Plaintiff also contends that the injection molded obturating band (rotating band) of the band patent is novel and operable because its rotating band is lighter, cheaper, seals better, and produces less wear and tear on the inside of the barrel. Plaintiff

also maintains that the '082 slot on the base of the penetrator is likewise novel, cheaper and safer than the conventional methods for transmitting torque from the sabot base to the penetrator.

There are two alleged infringing devices. The first devices are referred to as "contract sabots" in this Opinion; the 20mm armor-piercing spin-stabilized discarding sabot MK 149 MOD 1 and the modified MK 149 MOD 0 ammunition rounds are used in the Navy's Phalanx operation procured by the United States Navy and presently deployed in its fleet. Phalanx is the last line of defense for naval ships. It incorporates automatic radar detection into a close-loop track and kill defeat system for low-flying anti-ship missiles or aircraft that penetrate outer fleet area defense systems. The Phalanx is designed to fire 3,000 rounds per minute. Phalanx systems and MOD 1 rounds have also been furnished to several foreign governments. Plaintiff alleges that the MOD 1 rounds infringe all the patent claims of the sabot patent.[6] It is

---

**6.** The court finds little, if any distinction between claims 2–7 of the sabot patent. Therefore, the court only sets forth the following language of claims 1 and 2 since the language of claim 2 is representative of the elements in claims 2–7:

1. A spin stabilized discarding sabot projectile adapted for firing from the muzzle of a gun comprising a subcaliber core, a full-caliber base having a member for receiving the core, means mounted on said base to impart rotation to the projectile during traverse of a gun barrel, a sabot covering the subcaliber core, said sabot having a forward body portion for covering the forward portion of the core, a plurality of body segments secured to the forward body portion and extending rearwardly from the forward body portion in covering relationship to the core, the body segments engaging and being secured to the base, said body segments being defined by areas of weakness extending longitudinally of the sabot, first means for holding the forward portion of the body segments in fixed relation to each other as the projectile spins when fired, second means for holding the rear portion of the body segments in fixed relation to each other, said second means for releasing the rear portion of said body segments for separation and exposure to propelling gases issuing from the gun muzzle upon application of cen-

trifugal force to the projectile so that the sabot is removed from the projectile by a combination of centrifugal force imparted to the projectile and the force of propelling gases issuing from a gun barrel and impinging on the rearwardly opened body segments to remove the sabot from the subcaliber core.

2. A spin stabilized discarding sabot projectile adapted for firing from the muzzle of a gun comprising a subcaliber core, a full-caliber sabot base having means for receiving the core and means for receiving a sabot body, a sabot body, means for securing the sabot body in fixed relation to the base and in covering relation to the core, said sabot body having a forward body portion and a plurality of body segments connected to and extending rearwardly from the forward body portion in covering relationship to the core to define a rear body portion, said body segments being defined by radially spaced slots extending longitudinally of the sabot body, rupturable means for retaining the body segments in fixed relation to each other, said rupturable means for further fracturing on the application of centrifugal force to the projectile, and said rupturable means for further fracturing initially at the rear body segment portion of the sabot body with the fracture progressing toward the forward body portion so that the sabot body is removed from the projectile by the action of centrifugal force imparted to the

also plaintiff's belief that the MOD 1 rounds infringe the single claim of plaintiff's slot patent[7] and claims 1, 2, 5, 6, and 7 of the band patent.[8]

The second accused infringing devices are test sabots procured by the United States Navy which plaintiff contends infringe claims 1–7 of the sabot patent. Test sabots are used in single fire development of subcaliber penetrators.

Defendant contends that the sabot, slot, and band patents are invalid and not enforceable under 35 U.S.C. §§ 102, 103 (1982). Defendant also denies that the contract or test sabots infringe any asserted valid, invalid or unlicensed claim of the sabot patent. Defendant concedes infringement of the single claim slot patent and claims 1 and 2 of the band patent if the slot patent and the band patent claims are valid, enforceable and not owned by or otherwise not licensed to defendant. Defendant also concedes that projectiles procured prior to July 8, 1981, which had polycarbonate rotating bands, also infringe claims 5 and 6 of the band patent if claims 5 and 6 are valid, enforceable and not

owned by or otherwise not licensed to defendant. Defendant asserts, and plaintiff concedes, that sabots having glass fiber-filled Nylon 6/6 rotating bands do not infringe the band patent. Regarding the test sabots, defendant also denies infringement of any valid, invalid, or licensed claims of the sabot patent.

Defendant further maintains that it has title to, is licensed under, or otherwise has a right to practice the asserted claims of the sabot, slot, and band patents without compensation or liability to plaintiff because of government contracts, under which plaintiff's patented inventions were allegedly invented, first actually reduced to practice, or improved through the funds of defendant.

## DISCUSSION

A frequent and significant point of departure among the arguments of both parties is the operability of the claimed umbrella-type rear opening of the sabot developed by plaintiff. Neither plaintiff nor defendant is consistent[9] in its argument re-

projectile and by the force of propelling gases issuing from the gun barrel.

7. The slot patent claims the following:

1. A spin-stabilized discarding sabot projectile comprising a full-caliber sabot base formed of a relatively soft metal, means on said base for imparting rotation to the projectile during traverse of a gun barrel, a recess in the sabot base, a subcaliber core fitted into the recess, the core having a conical forward body portion and a generally cylindrical main body portion terminating in a base portion, said base portion of the core having a slot therein into which the metal base is pressed during launch of the projectile to increase the transfer of torque between the base and the core.

8. The band patent claims the following:

1. A projectile, a groove extending circumferentially of the exterior of the projectile, said groove being recessed below the surface of said projectile and having a generally cylindrical section extending circumferentially of projectile together with generally dovetailed fore and aft shoulder portions defining the sides of said groove, a plastic rotating band located in said groove and extending above the groove surface beyond the diameter of said projectile to engage gun rifling to obturate the propellant gases and to impart spin to

the projectile during launch, said cylindrical section having a smooth aft surface covering approximately one half of said cylindrical section, a knurled portion located forwardly of said aft surface, and shorter smooth surface located forwardly of the knurled surface.

2. A projectile according to claim 1 in which said rotating band comprises an injection molded plastic.

\* \* \* \* \* \*

5. A projectile according to claim 1 in which said retaining band comprises an injection molded polycarbonate.

6. A projectile according to claim 1 in which said rotating band comprises an injection moldable plastic having an elastic modulus of net less than $1 \times 10^5$ psi, a tensile strength of not less than 5,400 psi and an IZOD impact strength (notched) of not less than 4 pounds per inch.

7. A projectile according to claim 1 in which said rotating band comprises a ductile, elastic plastic having a density of 0.043 pounds per cubic inch, a modulus of elasticity of $34 \times 10^5$ psi, and tensile strength of 8,500 psi.

9. The court notes that these contradictions are not merely the result of otherwise permissible alternative, inconsistent, legal theories taken out of context.

garding the operation of the disputed sabot technology. Plaintiff asserts that the novel and operative feature of the sabot patent is the umbrella-type opening of the sabot "accomplished by the combined effect of centrifugal force and the impingement of muzzle gases from the exhausting gun barrel." At trial, plaintiff asserted that it did not develop this novel feature during the projectile contract, or use it with respect to fin-stabilized sabot research, but incorporated the necessary and existing technology into the work performed under the projectile contract. Yet, plaintiff's own monthly reports, made contemporaneous to the fin-stabilized sabot research, indicate very early on that fin-stabilized sabot petal "separation on exit from the muzzle [was] achieved in part by centrifugal force due to spin and in part by aerodynamic forces. Tests indicate that the four petals of the forward sabot element open from the rear and eventually split the unslotted shoulder." Monthly Report No. 2; *see also* Monthly Report No. 5 at 15. In view of the monthly reports of the projectile contract, it is the determination of this court that the sabots developed under the projectile contract incorporated plaintiff's allegedly novel umbrella opening concept.

Defendant asserts that plaintiff determined under the projectile contract that the fin-stabilized sabot opened in an "umbrella" fashion. Monthly Reports Nos. 1–11. Although defendant recognizes the superior performance and accuracy of the sabots under the projectile contract, defendant asserts that its most recent tests establish that the contract sabots do not operate in the umbrella fashion as reported in the applicable projectile contract monthly reports. Defendant was unable to establish that defendant's contract sabots failed to operate in the manner claimed in the Monthly Report Nos. 1–11. Thus, the court finds that defendant's critical reliance on the monthly reports and the derivative connection between the projectile contract and the allegedly infringing spin-stabilized sabot technology commits defendant to a consistent stand that the contract sabots also incorporate the sabot patent technolo-gy insofar as the allegedly infringing sabots incorporate the contract sabot art.

## I. *Patent Validity*

Patent disputes in the United States Claims Court require the court to make determinations on both validity and infringement, regardless of the conclusion reached on either validity or infringement. *Simmons Fastener Corp. v. Illinois Tool Works, Inc.,* 739 F.2d 1573, 1576 (Fed.Cir. 1984). After summarizing the legal standard for invalidity, each of the patents in dispute will be analyzed in accordance with the invalidity standard.

The court remarks at the outset that the patented inventions are useful as required under the Patent Act. 35 U.S.C. § 101 (1982). Not only do the facts of the case make this resoundingly clear, but this presumption was neither properly nor effectively challenged.

### A. *Presumption of Validity*

Issued patents are presumed valid. 35 U.S.C. § 282 (1982). Thus, the court is required to approach patent challenges by presuming that patented inventions are useful, novel and nonobvious under Title 35 of the Patent Act. *Graham v. John Deere,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). This presumption follows the arduous patent prosecution requiring a hopeful patentee to show that the invention and application satisfy a number of statutory requirements. It presumes that the expertise of the United States Patent and Trademark Office (PTO) issues only valid patents. In this case, defendant contends that the presumption of validity of the sabot, band, and slot patents is overcome by the content of prior art not cited in the prosecution history. The touchstone, however, is not the mere introduction of other prior art, but "whether the uncited art is sufficiently more relevant than that cited to serve as evidence of obviousness...." *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.,* 730 F.2d 1452, 1459 (Fed.Cir.1984). The introduction of prior art more pertinent than that which

the examiner considered does not weaken the statutory presumption of validity. *Leinoff v. Louis Milona & Sons, Inc.,* 726 F.2d 734, 738 (Fed.Cir.1984).

### B. *Invalidity under 35 U.S.C. § 102*

35 U.S.C. § 102 precludes patentability if the invention was anticipated by prior art. Section 102(a) and (b) read as follows:

A person shall be entitled to a patent unless—

 (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

 (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States. . . .

35 U.S.C. § 102(a)–(b) (1982).

### 1. *Anticipation*

 Anticipation or lack of novelty under section 102(a) is established only when a single prior art reference expressly describes or inherently contains each element of a claimed invention, functioning in substantially the same way to produce substantially the same result. *Tate Engineering, Inc. v. United States,* 201 Ct.Cl. 711, 722, 477 F.2d 1336, 1342 (1973). Reference teachings may *not* be combined under section 102 to build a defense based on antici-

pation, but may be considered probative of knowledge of one of ordinary skill in the art. *Studiengesellschaft Kohle, m.b.H. v. Dart Industries, Inc.,* 726 F.2d 724, 726–27 (Fed.Cir.1984). Disclosure of art places knowledge of the invention in the possession of the public. *In Re Donohue,* 632 F.2d 123, 125 (CCPA 1980).

### a. *Anticipation of the Sabot Patent*

The presumption of validity places the burden of going forward procedurally and substantively squarely upon the party challenging validity. Defendant relies upon ten U.S. patents [10], two patents from foreign countries [11] and several technical reports [12] as relevant prior art to the sabot patent. Regarding patents and publications as prior art, the United States Court of Appeals for the Federal Circuit stated in *American Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350 (Fed.Cir.1984) that:

When no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents.

*Id.* at 1359.

Seven of the patents cited by defendant, however, are not cited or referenced any-

---

10. U.S. Patent No. 3,435,768 of Engel issued April 1, 1969, filed July 24, 1967 (Engel '768); U.S. Patent No. 3,446,147 of Engel issued May 27, 1969, filed March 1, 1967 (Engel '147); U.S. Patent No. 3,496,869 of Engel issued February 24, 1970, filed July 28, 1967 (Engel '869); U.S. Patent No. 1,973,604 of Brandt issued September 11, 1934, filed July 3, 1933 (Brandt '604); U.S. Patent No. 2,616,372 of Frantik issued November 4, 1952, filed August 2, 1945 (Frantik '372); U.S. Patent No. 2,638,051 of Critchfield issued May 12, 1953, filed January 18, 1944 (Critchfield '051); U.S. Patent No. 2,992,612 of Critchfield issued July 18, 1962, filed July 14, 1944 (Critchfield '612); U.S. Patent No. 2,993,-444 of Hablutzel issued July 25, 1961, filed Au-

gust 2, 1945 (Hablutzel '444); U.S. Patent No. 2,996,010 of Frantik issued August 15, 1961, filed June 30, 1944 (Frantik '010); and U.S. Patent No. 3,111,902 of Taylor issued November 26, 1963, filed October 8, 1962 (Taylor '902).

11. West German Patent No. 1,262,830 of Menzel issued March 7, 1968, filed September 2, 1964 (Menzel '830); and British Patent No. 145,808 of Allom issued August 7, 1920, filed August 17, 1917 (Allom '808).

12. National Defense Research Committee Report A–428 (NDRC); and Naval Ordnance Report 4245 (NAVORD).

where in the sabot patent prosecution history. With respect to uncited references, the Federal Circuit has stated:

> When an attacker, in sustaining the burden imposed by § 282, produces prior art or other evidence *not* considered in the PTO, there is, however, *no reason to defer* to the PTO so far as *its* effect on validity is concerned. Indeed, new prior art not before the PTO may so clearly invalidate a patent that the burden is fully sustained merely by proving its existence and applying the proper law; but that has no effect on the presumption or on who has the burden of proof. They are static.... Neither does the *standard* of proof change; it must be by clear and convincing evidence or its equivalent, by whatever form of words it may be expressed.... [N]ew prior art or other invalidating evidence not before the PTO ... eliminate[s], or at least reduce[s], the element of deference due the PTO, thereby partially, if not wholly, *discharging* the attacker's burden, but neither shifting nor lightening it or changing the standard of proof.... [New prior art] may, therefore, carry more weight and go further toward sustaining the attacker's unchanging burden.

*Id.* at 1359–60 (emphasis in original).

Defendant has satisfied the burden of going forward with production of relevant prior art not considered by the PTO. Plaintiff admits that all the U.S. patents cited by defendant are PTO Class 102–Ammunition and Explosives, subclass 93 or 94 directed to rifling bands and sabots. Plaintiff's Post-Trial Requested Findings of Fact and Conclusions of Law on Liability Issues (PRF) at 50. Thus, the court is to consider the pertinence and teachings of these additional references as they are offered by defendant to establish invalidity.

Claim 1 only teaches the further separation of "rearwardly opened" sabot segments; it does not claim that sabot separation initiates at the rear as claims 2–7 expressly claim. Brandt '604, Allom '808, and Taylor '902 all disclose: a spin-stabilized sabot comprising a full-caliber base with a means or member for receiving a sub-caliber core, a sabot body or bourrelet with a plurality of rearwardly extending body segments defined by slots or recesses of longitudinal weakness, which body segments having means for fixing the segments together, which means release under centrifugal force and the release is aided by the impingement of propellant gases.

Although it may be argued that several of these patents claim unibody patents and that the prior art should be inapplicable, the court notes that claim 1 of the sabot patent does not preclude the sabot configuration from being unibody. This limitation should not be read into claims 1, 2, 3, 4, or 6, when claims 5 and 7 include this limitation by teaching that the sabot body and base are separated from the penetrator in different fashions. In addition, Frantik clearly disclosed that one of ordinary skill in the art would have considered making such a configuration in one or more body parts.

■ Although the sabot patent claims are to be read in light of the specifications that teach of initial petal rupture at the rearmost body portion, public policy will not permit a claim to be broader than it should be. Not everything expressed in the patent specification must be read into all claims. *Raytheon Co. v. Roper Corp.,* 724 F.2d 951, 957 (Fed.Cir.1983). Patent claims are the measure of an invention, and validity must be determined on the basis of what is claimed since their purpose is to force the patentee to insert in the claims those limitations and relationships regarded to be in the invention. *Leesona Corp. v. United States,* 208 Ct.Cl. 871, 892, 530 F.2d 896, 908–09 (1976). The claims, not the specifications, measure the invention. *Smith v. Snow,* 294 U.S. 1, 11, 55 S.Ct. 279, 283, 79 L.Ed. 721 (1935).

■ After studying the specifications and claims of each of the patents cited as prior art by defendant, this court agrees with the PTO that claims 1–7 of the sabot patent are not anticipated by the patents listed in the sabot patent prosecution history. This court also agrees with plaintiff

that the patents in the section 102 petition do not anticipate the sabot patent claims. However, the patents cited in the prosecution history and section 102 petition do not exhaust the prior art that would have been searched and found under the rifling band and sabot subclasses. This court has carefully reviewed the noncited rifling band and sabot subclass patents cited by defendant and concludes that claim 1 of the sabot patent is anticipated by Frantik '372, Frantik '010, Brandt '604, Allom '808, and Taylor '902, while claims 2–7 of the sabot patent are not anticipated by any single prior art reference. Therefore, claim 1 is invalidated because each and every element of the claim, in the claimed configuration, are anticipated by the art at the time. 35 U.S.C. § 102(a) (1982). Any other conclusion would permit claim 1 to be far too broad in light of the express claims and the limitations of claims 2–7 and all other art classified as rifling bands or sabots.

### b. *Anticipation of the Band Patent*

Defendant does not assert that any single prior art reference anticipates the claims of plaintiff's band patent.

### c. *Anticipation of the Slot Patent*

The slot patent claims the following: A spin-stabilized discarding sabot projectile comprising a full caliber sabot base formed of a relatively soft metal, means on said sabot base for imparting rotation to the projectile firing traverse of a gun barrel, a recess in the sabot base, a subcaliber core fitted into the recess, the core having a conical forward body portion and a generally cylindrical main body portion terminating in a base portion, said base portion of the core having a slot therein into which the metal base is pressed during launch of the projectile to increase the transfer of torque between the base and the core.

Slot patent, col. 8, lines 54–64.

The court agrees with plaintiff that each element of the slot patent is not anticipated by U.S. Patent No. 2,991,720, issued to Dunlap July 11, 1961 (Dunlap '720). Dunlap '720 teaches of a spin-stabilized discarding sabot whose full-caliber base includes a configuration comprising a forward member, or skirt, providing a recess into which the base portion of a subcaliber core is received. The core is generally cylindrical in its main body with a conical forward portion. Dunlap '720, col. 4, lines 16–21. The sabot base has a means for imparting spin to the projectile by engaging the rifling of the barrel during launch. The parties' apparent point of contention rests in the remaining essential element—the novelty of the slot in the base portion of the slot patent core which transmits spin from the base to the core.

Defendant asserts that Dunlap '720 and America Machine Foundry Company Progress Report No. 10 dated August 31, 1955 (AMFC), neither of which were cited by the PTO in the slot patent or its prosecutorial history, disclose the engraving of a harder core into a softer base in order to assure the transmission of torque from the projectile to the core.

■ After considering both references, it is the conclusion of this court that the knurled surfaces of neither Dunlap '720 nor AMFC anticipate the '082's "slot therein." Although a slot is a groove, and a series of grooves is essentially a knurled surface, the slot patent is not anticipated by the knurled surface prior art. The Court of Appeals for the Federal Circuit has determined that if the general aspects are the same and the differences in minor matters are only such as would suggest itself to one of ordinary skill in the art, a prior art disclosure that "almost" meets the standard may render the claim invalid under Section 103, but does not "anticipate" the claimed invention under Section 102. *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed.Cir.1983). This court's conclusion that the slot similarly transmits torque from the projectile to the core, as does the knurled surface, is only applicable to the obviousness standard under Section 103. Thus, the slot patent is not anticipated by the prior art.

### 2. "On Sale" Bar of 35 U.S.C. § 102

■ If the device described in a patented claim is "on sale" in the United States more than one year prior to the filing of the patent application, the claimed invention is invalid under 35 U.S.C. § 102(b) (1982). A single sale or offer to sell is enough to bar patentability. *In re Caveney*, 761 F.2d 671, 675–76 (Fed.Cir. 1985). The United States Court of Appeals for the Federal Circuit recently confirmed the application of a test[13] set forth in *Timely Products Corp. v. Arron*, 523 F.2d 288 (2d Cir.1975), which determines "the existence of a bar [to patentability] where the offer to sell concerns articles which have not been produced at the time the purchase is solicited." *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed Cir.1984). The *Timely* test requires:

1. the invention to be embodied in the devices offered for sale,
2. the invention to be reduced to practice and operable more than one year prior to the respective patent application, and,
3. the devices to have been on sale for profit, not for experimentation.

*Timely*, 523 F.2d at 302.

The Federal Circuit accepted the district court's rejection of the "on hand" test, requiring a device which incorporates the invention to exist in its ordinary or contemplated usable form and to be ready for delivery. The Federal Circuit made it clear that "[o]ffers to sell can be made whether or not products are actually on hand." *Barmag*, 731 F.2d at 836.

#### a. "On Sale" Bar of the Sabot Patent

■ Even if the court assumes that fin-stabilized sabot devices used in the demonstrations more than one year before the application date of the sabot patent embodied the patented spin-stabilized sabot technology (regarding prongs 1 and 2 of the *Timely* test), defendant did not offer persuasive evidence to rebut plaintiff's showing that any use of the sabot patent art, whether fin-stabilized sabot or spin-stabilized sabot, was strictly experimental at the time. Regarding the third prong, defendant asserts that following the July, 1967 demonstration at Aberdeen, but more that one year before the August, 1969 application date of the sabot patent, defendant purchased 100 spin-stabilized sabot projectiles from plaintiff for use in another demonstration in Aberdeen. Plaintiff participated in a private demonstration of the fin-stabilized sabot and spin-stabilized sabot at the Army's Aberdeen proving ground in July, 1967. This demonstration required firing approximately fifty fin-stabilized sabot and fifty spin-stabilized sabot rounds. However, plaintiff asserts that its use of a spin-stabilized sabot prior to August 29, 1968 was only experimental.

The court finds that defendant provided the fin-stabilized sabot projectiles while plaintiff provided the spin-stabilized sabot projectiles, without remuneration, in order to obtain test data on the round's capability. Defendant's assertion lacks sufficient evidence to rebut plaintiff's showing of experimental use to obtain data for firings at 500 feet. Defendant's proof neither establishes a credible *prima facie* sale one year before the application of the sabot patent, nor establishes that the alleged sale was for profit. Thus, the court concludes that plaintiff's sabot technology was not "on sale" more than one year before the sabot patent was filed.

#### b. "On Sale" Bar of the Band Patent

■ Defendant maintains that devices embodying the band patent invention were offered for sale or on sale by plaintiff more than one year before the June 1, 1972 filing date of the band patent. Defendant points to Navy Contract N00017–71C–4206 (pen-

---

**13.** The Federal Circuit noted that the *Timely* test is not the answer in all cases such as where there has been no physical embodiment yet the device is still offered for sale. *Barmag*, 731 F.2d at 837. However, this court considers the application of the *Timely* test to be adequate for this case because the *Timely* test is a more stringent standard.

etrator contract)[14] between the Navy and General Dynamics (GD) and to the respective subcontract under GD purchase order No. 210825–PB between GD and plaintiff. Defendant asserts that these contractual arrangements evidence plaintiff's offer to sell three hundred optimized spin-stabilized sabot, which defendant alleges incorporated plaintiff's patented band.

With respect to the reduction to practice prong of the *Timely* test, plaintiff acknowledges that the band patent was actually reduced to practice by October, 1970. Plaintiff's Requested Findings of Fact 52–54. Indeed, plaintiff had conducted extensive research into the best design for the obturating band prior to the penetrator contract and had discovered the most effective configuration of the channel for placement of the obturating band. Plaintiff had established the significance and operation of the respective lengths of smooth surfaces in relation to the knurled surface, the dovetailed corners and the inclined sides of the channel. Plaintiff's drawings substantiate the depth of its invention and reduction to practice before December 1970.

Under the "on sale for profit, not for experimentation" prong of the *Timely* test, plaintiff offered to conduct the penetrator contract project for a fixed price in December, 1970 in response to GD's needs under the penetrator contract. That price included three hundred complete rounds. The projectile fabrication was to embody the "20SSDS discarding sabot developed by" plaintiff. Although no costs for task IX, the production of the 300 rounds, were included in this proposal, and although delivery to General Dynamics was to follow receipt of a purchase order from General Dynamics, plaintiff does not refute the fact that it offered its spin-stabilized sabot, incorporating the band patent art, for sale

for the prices set forth in appendix B of the financial section of the proposal. The court concludes that plaintiff's original proposal was an offer to sell for profit, regardless of plaintiff's withdrawal of the offer. *Barmag*, 731 F.2d 831, 837. "A *mere offer for sale* is sufficient to constitute a bar to patentability." *See, e.g., General Electric Co. v. United States*, 228 Ct.Cl. 192, 200, 654 F.2d 55, 60 (1981) (emphasis in original).

The only remaining question under *Timely* is whether the band patent invention was embodied in the offer to sell 20SSDS hardware. Plaintiff admits that the research and development of the band patent art was oriented toward fulfilling the requirements of the Bushmaster system. The device now used by the government, which allegedly infringes the patented 20mm spin-stabilized sabot invention, incorporates the art of the Bushmaster spin-stabilized sabot. The work plaintiff actually performed under the penetrator contract confirms that the 20mm spin-stabilized sabot included the band patent. Plaintiff's reports and disclosures establish that the superior obturating band developed by plaintiff was an integral part of the 20mm spin-stabilized sabot used. Plaintiff's own document entitled "PACIFIC TECHNICA CORPORATION INJECTION MOLDED PLASTIC ROTATING BAND FOR SPIN STABILIZED AMMUNITION" dated August 12, 1971, was merely a summation of the development plaintiff claimed to have done prior to October, 1971. The report reiterates the critical contribution of the band patent art at pages 8–13. The report proclaims that the lexan "injection molded rotating band yields superior propellant gas obturation to [that] obtained with either copper alloy or a sintered iron rotating

---

**14.** The Navy issued the penetrator contract to GD on December 12, 1970 to develop an optimum round for Phalanx. GD subcontracted with plaintiff to this end. As a subcontract of the penetrator contract, the GD purchase order to plaintiff was subject to the penetrator contract. The penetrator contract called for a "detailed study of the PATEC 20 SSDS (spin-stabilized sabot) projectile for the purpose of deter-

mining the range of applicable modifications to the penetrator and selecting and testing those modifications which will provide optimum performance." Furthermore, the test evaluations were to lead to compatibility "with the proven PATEC 20 spin-stabilized sabot discarding sabot." Optimum performance of the penetrator in this situation meant obtaining optimum performance of a 20mm spin-stabilized sabot.

band." The report continues to assert that "better gas obturation of the injection molded plastic rotating band is also pronounced for projectiles fired from partially worn gun barrels. This effect is due to the elasticity of the band and again results in higher muzzle velocities, as well as decreased standard deviation of muzzle velocity in round-to-round firings." It is the finding of this court that the contracted optimization of plaintiff's penetrator under the GD purchase order enjoyed the incorporation of the band patent art as an integral part of the success of the penetrator's performance.

Although the emphasis of the penetrator contract sought the refining and or modification of 20mm spin-stabilized sabot penetrators, defendant has shown this court clearly and convincingly that plaintiff's efforts under the penetrator contract required the reduction or minimization of projectile dispersion and velocity decay. Plaintiff incorporated the band patent art into its work under the penetrator contract in order to achieve these purchase order objectives. Plaintiff's own documentary proclaims this to be the case.

Plaintiff may not claim that the band patent art was not available to defendant under the penetrator contract because of a statement in plaintiff's cover letter to the proposed agreement between GD and plaintiff. Plaintiff used the following language, without success, in an attempt to condition the GD purchase order:

> It is recognized by the Buyer that the components and processes used for work on the deliverable items under this contract were developed at private expense and that performance of this contract shall not be interpreted in any way, either express or implied, that the Buyer has purchased any rights in the data.

This letter, however, was not received until some time after the original offer for sale in December, 1970.

Therefore, this court finds that more than one year before June 1, 1972, the band patent art was offered for sale as a necessary and integral part of the complete PA-TEC 20mm spin-stabilized sabot, in accordance with plaintiff's proposal to meet the needs of the GD purchase order. This offer for sale invalidates the band patent. The inclusion of the band patent art in the GD purchase order is also discussed below under licensing, and the relevant parts of that discussion are also incorporated into the determination of the applicability of the § 102(b) "on sale" bar.

### c. *"On Sale" Bar of the Slot Patent*

Defendant does not challenge the validity of the slot patent on grounds of the "on sale" statutory bar.

### C. *Section 103 Obviousness*

In a determination of obviousness

> [a] patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103 (1982).

Prima facie obviousness requires a showing that prior art teachings appear sufficient to one of ordinary skill in the art to suggest making the claimed invention or modification. *In re Lalu*, 747 F.2d 703, 705 (Fed.Cir.1984). This does not mean that mere combinations of older elements establish that an invention was obvious. *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1546 (Fed.Cir. 1984). The "each-element-is-old" approach has been resoundingly rejected. *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476 (Fed.Cir.1984). Yet, prior art related to the invention and other prior art that suggests the possibility of further improvement by combination with principles known in the art and which achieves the same result as the claimed invention, may be combined to establish obviousness. *In re Sernaker*, 702 F.2d 989, 994 (Fed.Cir.1983). The test under section 103 is not whether an im-

provement or a use set forth in a patent would have been obvious or nonobvious. The test is whether the claimed invention, considered as a whole would have been obvious or nonobvious. 35 U.S.C. § 103 (1982). Likewise, there must be something in the prior art as a whole suggesting the desirability and obviousness of making the combination. *EWP Corp. v. Reliance Universal, Inc.*, 755 F.2d 898, 907 (Fed.Cir. 1985); *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1462 (Fed.Cir.1984). Although it is improper to consider the improvement or difference between the claimed invention and the prior art as the invention, the difference, even though slight, may be the very key to success and advancement in the art. *Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed.Cir.1984).

█ It is also established that "[i]t is wrong to use the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit." *Orthopedic Equipment Co. v. United States*, 702 F.2d 1005, 1012 (Fed.Cir.1983). That is, hindsight analysis is improper. The prior art selected must not be art which would be chosen with the advantage of hindsight or knowledge of the invention, but prior art that one of ordinary skill in the art would have been presumed to know at the time. *In re Antle*, 444 F.2d 1168 (CCPA 1971).

█ The trilogy of factual inquiries outlined in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) provides analytical guidelines in the determination of obviousness required under section 103. In evaluating whether an invention is obvious, this court must determine the 1) scope and content of the prior art, 2) differences between the prior art and the claims at issue, and, 3) level of ordinary skill in the art. *Id.*

█ To determine the scope and content of relevant art pertaining to the claims in suit it is proper to consider the nature of the pertinent problem confronting the in-

ventor. *Orthopedic Equipment Co. v. United States*, 702 F.2d 1005, 1009 (Fed. Cir.1983) (citing *Weather Engineering Corp. of America v. United States*, 222 Ct.Cl. 322, 334–35, 614 F.2d 281, 287 (1980)). This involves examining the claims in suit, the type of skill required to understand the disclosure, and the type of art applied to the claims by the PTO. Section 103 expressly limits the context of the obviousness determination to "the time the invention was made." 35 U.S.C. § 103 (1982).

Differences between the prior art and the patent at issue requires analyzing the breadth of the claims in dispute within the norms of proper claim construction, and against the prior art.

The level of ordinary skill in the art is determined on a case-by-case basis. The Federal Circuit cited with approval a list of factors helpful in making such a determination, including: various prior art approaches employed, types of problems encountered in the art, the rapidity with which innovations are made, the sophistication of the technology involved, and educational background of those actively working in the field. *Orthopedic Equipment Co. v. United States*, 702 F.2d 1005, 1011 (Fed.Cir.1983) (citing *Jacobson Brothers v. United States*, 206 Ct.Cl. 518, 512 F.2d 1065 (1975)). "We presume full knowledge by the inventor of all prior art in the field of his endeavor" at the time the invention was made. *Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1572 (Fed.Cir. 1984).

█ *Graham* also held that commercial success, long felt and unresolved need, and the failure of others skilled in the art to resolve the problem are secondary indicia of nonobviousness. The Federal Circuit has advised that "evidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir.1983); *Simmons Fastener Corp. v. Illi-*

*nois Tool Works,* 739 F.2d 1573, 1575 (Fed. Cir.1984). These secondary conditions are particularly helpful in cases where hindsight is a great danger, *Corporate Communications Consultants, Inc. v. Columbia Pictures Industries, Inc.,* 576 F.Supp. 1429, 1437 (S.D.N.Y.1983), especially where unexpected or surprising results are achieved. *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.,* 730 F.2d 1452, 1461–62 (Fed.Cir.1984). Secondary considerations are indicia of nonobviousness only; they are not requirements for nonobviousness, *Leinoff v. Louis Milona & Sons, Inc.,* 726 F.2d 734, 740 (Fed.Cir. 1984), but they must be considered before a legal conclusion concerning obviousness under section 103 is reached. *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1538 (Fed.Cir.1983). If secondary evidence is to be given substantial weight, there must be a nexus between the merits of the claimed invention and the evidence offered. Given this framework for the obviousness analysis, the court will apply these standards to the sabot, band, and slot patents.

### 1. *Obviousness Analysis of the Sabot Patent*

In the mid-1960's, spin-stabilized sabot ballistics were being developed. Various approaches to spin-stabilized sabot art had been developed to meet different needs. All the U.S. and foreign patents cited by defendant are within the relevant scope of the prior art. These references clearly indicate the understanding and research orientation of those skilled in the art antedating Feldmann's work. Inventors had experienced problems with yaw and dispersion, poor obturation and propulsion, ineffective petal separation, automatic firing, and subcaliber core retention and alignment. Spin-stabilized sabot development was certainly not in its infancy as plaintiff would have this court believe. For example U.S. Patents, under the rifling band or sabot classification, issued in 1933, 1952, 1953, 1961, 1962, 1963. Foreign patents brought to the attention of the court issued in 1920 and 1968. Though not probative of knowledge of one of skill in the art, other's inventions

made during Feldmann's inventive years also indictate the advanced time-line of innovation in discarding sabot technology.

#### a. *Ordinary Skill in Sabot Art*

Persons working in the pertinent ammunition fields generally had college degrees in technical fields, but this is not conclusive of ordinary skill in sabot art. When the level of sophistication of the technology permits persons having periods of substantial training and/or experience in ammunition design to readily understand or appreciate the relevant art, such persons indicate the level of ordinary skill in the art. *See Orthopedic Equipment Co. v. United States,* 702 F.2d 1005, 1011 (Fed.Cir.1983). Prior art patents and publications of record are also probative of ordinary skill in sabot art. *See Union Carbide Corp. v. American Can Co.,* 724 F.2d 1567, 1572 (Fed.Cir. 1984).

In this case, the court finds that formal education and training in discarding sabot manufacture and design is not necessary, though helpful, in establishing ordinary skill in the art during the years pertinent to this suit. Substantial training or experience, and prior patents and technical reports more accurately establish ordinary skill in discarding sabot art during the relevant times in this suit. This conclusion applies equally to the sabot, band, and slot patents.

#### b. *Scope and Content of Prior Sabot Art*

The context in which the court examines the scope and content of the prior art focuses on the alleged problem that confronted Feldmann. Feldmann wished to develop a discarding sabot which would minimize yaw and dispersion while achieving maximum distance and penetration. To this end, Feldmann researched discarding sabot ballistics. The claims in suit are classified as ammunitions and explosives (class 102) and are subclassified by the PTO as rifling bands or sabots (102–93/94). This group of patents pertains to discarding sabot ballis-

tics. Although there may be analogous art, none has been offered as evidence in this case. Therefore this court's analysis concentrates on 102–93/94 prior art and related or analogous foreign art available at the time the invention was made.

Plaintiff contends that small caliber spin-stabilized sabot technology was not given attention until the mid–1960s, and that most of the art cited by defendant dealt with nonapplicable large-caliber single-fire rounds. This court rejects plaintiff's assertion that discarding sabot technology addressing large-caliber single-fire rounds is not applicable to smaller, automatic fire rounds. Plaintiff did not carry its burden to particularize the inapplicability of large-caliber single-fire art. It is well established that merely changing the size of a device is not an invention. In this case it would not be "surprising" or "unexpected" to one of ordinary skill in the art to realize that principles applicable to large caliber discarding sabots would be helpful in achieving the same result if appropriately applied to a smaller projectile. Furthermore, Allom '808 and Critchfield '051 both address small caliber projectiles and plaintiff's sabot patent is not limited to 20mm projectiles. Allom '808, p. 1, lines 8–12; Critchfield '051, col. 4, lines 11–13.

In addition, without realizing it, plaintiff seeks to refute a principle upon which it must rely for sufficient conception and reduction to practice of the sabot patent. Plaintiff has never asserted that prior to the projectile contract, plaintiff test fired the sabot patent under automatic conditions. Furthermore, plaintiff relies upon the ability of one of ordinary skill in the art to refine the device to automatic use. *See Application of Borst*, 52 CCPA 1398, 345 F.2d 851 (1965). Using the same rationale, single-fire art is applicable to this obviousness determination so far as one of ordinary skill in the art could or would adapt that art to rapid-fire application. Plaintiff's attempt to limit the scope of the prior art must fail because one of the objectives of the claimed invention was to provide a projectile "adaptable for single or automatic firing." Sabot patent, col. 2, line 58; col.

3, lines 9–10. It is the determination of this court that all the art classified by the PTO as 102–93/94 is sufficiently related to 20mm spin-stabilized sabot or fin-stabilized sabot technology to clearly define much of the content and scope of the prior art pertinent to this case.

Plaintiff relies heavily upon its assertion that no one "other than Feldmann recognized the dynamics of the various forces in front of the muzzle of a gun and used the centrifugal forces and propellant gases present to cause immediate fracture and separation, rear to front, of the sabot ... and removal of a one piece sabot base from the subcaliber penetrator by aerodynamic drag force." Although this may be true so far as the prior art cited in the prosecution history, yet defendant has "clearly and convincingly" refuted this assertion. Defendant has directed this court's attention to several 102/93–94 patents that are not cited in the sabot patent prosecution history, but are pertinent to the obviousness inquiry. Defendant has cited prior art that teaches the principles of plaintiff's sabot patent prior to plaintiff's patent application. Plaintiff never attempted to distinguish Taylor '902, which expressly addresses gaseous forces in front of the muzzle, and teaches that "[i]t is a well known fact that for a short period of time after leaving the launch tube, the projectile is in reality flying backwards with respect to the flow of propellant gases." Taylor '902, col. 3, lines 15–18. It can only follow that those of ordinary skill in the art would not ignore this significant stage of discarding sabot launch. Indeed, several approaches were developed to take advantage of this phenomena in the relevant prior art.

The sabot and obturator in Taylor '902 (issued in 1963) were designed to have longitudinal slits so "that on leaving the gun muzzle they break up and disintegrate under the action of muzzle blast, air lift, or centrifugal force due to the spin of the combination produced by the rifling usually found in a gun bore." Taylor '902, col. 2, lines 29–34.

Allom '808, issued July 8, 1920, declares that the sabot components "are detached from the tail of the projectile immediately after leaving the muzzle." Allom '808, p. 2, lines 103–06. "The pressure of the [propellant] gases and the action of centrifugal force cause the components of the [sabot] cylinder to break away, as shown in Figure 3." Allom '808, p. 3, lines 85–88. This leaves little doubt as to the cognizance of the significance of propellant gases in front of the muzzle established by prior art.

### c. Differences Between Prior Art and Sabot Claims

Plaintiff claims that Feldmann was the first to appreciate petal separation that initiates at the rear of the sabot body. Yet, Frantik '372, issued November 5, 1952, teaches that the bourrelet portion of the sabot body is "shed from the core by a combination of centrifugal forces and cantilever action which ruptures the uncut [forward-most] portion of the bourrelet as well as the bearing ring." Frantik '372, col. 3, lines 40–44. Likewise, Frantik '010, issued August 15 1961, teaches of a full-caliber sabot whose longitudinal segments release from the core under centrifugal force by a cantilever action when the projectile emerges from the gun muzzle. Frantik '010, col. 1, lines 9–14. The longitudinal segments are held together by a means which ruptures from the rear to front. Frantik '010, col. 1, lines 33–39; see also NRDC Report. These prior art sources teach of petal separation that starts at the rear-most part of the sabot body and ends at the front-part of the sabot body.

Frantik '372 and '010 teach analogous and similar principles. They teach that "the extra mass of the rear end portions of the segments due to the shoulders 16 and 17 cause the rear portions of the segments to move outwardly [first], under the centrifugal force, about the shoulders 13[, which, acting] as pivots[, retain the forward portion] and thereby exert a [forwardly progressing] cantilever action on the turning band." Frantik '010, col. 2, lines 38–43. Thus, sabot petal separation may be achieved by centrifugal force which causes the forward portion of the sabot petals to move transverse to the projectile axis only after the rearward portion of the petals have done so. An annular retaining band on the forward portion of the sabot body is first broken by a cantilever action, like that in Figure 1 of the sabot patent claim. This permits the under surface of the Frantik '372 and '010 petals to be acted further upon by a combination of impinging propellant gases and centrifugal force. This is precisely the novel operation claimed by plaintiff's sabot patent.

In the judgment of this court, the scope and content of the prior art from the cantilever action of the Frantik '372 and '010 petal separation recognized that any other method of retaining the forward body portion of the sabot body would have achieved the same or similar results. This conclusion withstands the challenge that Frantik '372 does not expressly address the application of aerodynamic drag forces in aiding sabot base separation. Frantik '010. Such a principle would have been the mere application of the most fundamental principle of aerodynamics. Knowledge of such a principle in spin-stabilized sabot technology by one of ordinary skill in the art at the time was clearly evidenced by Frantik '010.

Plaintiff also attempts to distinguish the art cited by defendant by arguing that Frantik '372 art is only applicable to delay sabots associated with muzzle brake application. This court rejects that argument. Part of plaintiff's argument improperly relies upon a distinction that focuses on the action of the sabot base, not the sabot body, and plaintiff's unpersuasive argument speculates as to the operation of Frantik '372. Sabot art teaches that bourrelet separation principles are equally applicable to delay and non-delay devices. It is also irrelevant that Frantik did not mention impinging muzzle gases; they are inherent to the fire of a muzzle launch. One of ordinary skill in sabot art would have readily understood that the overtaking muzzle blast would temporarily aid removal of sabot petals from the subcaliber core whether the petals initially opened from the front or

the back when emerging from the muzzle. Aft opening of the petals in a reverse gas flow leads to only one conclusion—that the inherently impinging propellant gases would be employed to augment petal sabot separation.

Defendant has clearly and convincingly shown that sabot segments had, prior to Feldmann's claimed invention, opened from aft to fore under the influence of centrifugal force in the presence of reverse flow propellant gases. Taylor, Allom, and Brandt, all skilled in the art, recognized and taught the value of the inherently impinging gases.

Plaintiff also contends that only Feldmann understood or developed the "removal of a one piece sabot base from the subcaliber penetrator by aerodynamic force." Plaintiff maintains that the base 1) receives the rear end of the penetrator, 2) receives the sabot body, 3) has an annular obturating band which also engages the barrel rifling to generate spin, 4) provides a crimping connection for connection to the cartridge, 5) receives and transmits to the penetrator the forces of the propelling gases, and 6) transmits spin to the penetrator.

Defendant offered Menzel '830, issued March 7, 1968. Menzel '830 teaches a discarding sabot comprising a sabot body and a sabot base. Menzel '830, col. 1, lines 1–6. It discloses a "Bodenstueck" or a sabot base, which has a recess for receiving the rear end of a subcaliber core. The sabot body, the "Mantel," is weakened by longitudinal slots. The mantel is attached over and around the bodenstueck. Menzel '830 makes no provision for the destruction or separation of the bodenstueck into segments. But to the contrary, the bodenstueck is to be made of higher strength material than the mantel. No provision is made to attach the penetrator to the bodenstueck apart from setting it in the recess. The bodenstueck has an axial cross-section area greater than that of the penetrator, and is designed to minimize flight yaw. Menzel '830, col. 4, lines 1–4. The only inference one of ordinary skill in the art can draw is that the base is detached by aerodynamic drag forces because the entire intact sabot base separates itself from the core. Menzel '830 col. 1, lines 15–16.

In addition, Hablutzel '444, issued July 25, 1961, teaches of a sabot base which is "swept from the core by wind resistance." Hablutzel '444, col. 3, lines 29–30. Critchfield '051, issued May 12, 1953, and '612 issued July 18, 1961 both teach of solid bases inherently separated by aerodynamic drag.

█ In sum, defendant's showing establishes a prima facie obviousness, suggesting to one of ordinary skill in the art the claimed sabot invention. *See In re Lalu,* 747 F.2d 703, 705 (Fed.Cir.1984). Although not fatal to patentability, the desirability of transmitting thrust and spin to the penetrator and the need to diminish launch and trajectory yaw and dispersion suggest the combination of the prior art elements. *See Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.,* 730 F.2d 1452, 1462 (Fed.Cir.1984). Under the three-part analysis of Graham, this court determines that the sabot invention, considered as a whole, would have been obvious to one of ordinary skill in the art. 35 U.S.C. § 103 (1982).

d. *Secondary Considerations*

(1) *Commercial Success*

Plaintiff asserts that defendant's Phalanx system, only because Phalanx was equipped with allegedly infringing devices, enjoyed commercial success in the U.S., Great Britain, France, and Australia. Yet, "[a] nexus is required between the merits of the claimed invention and the evidence offered, if that evidence is to be given substantial weight enroute to a conclusion on the obviousness issue." *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1539 (Fed.Cir.1983). Defendant's commercially successful systems use sabot art in the American Phalanx and British Royal Army Research and Development Establishment (RARDE) systems. Defendant does not deny that Phalanx enjoyed commercial success, but contends that the success had

nothing to do with the patented sabot principles, and, instead, was due to the design and function of the Phalanx closed-loop defeat system. Plaintiff must show that the commercial success was due to the sabot patent advancement, not equally due to the merits of the Phalanx system. *See id.*

Even though the sabot patent, in and of itself, may have enjoyed commercial success with respect to British needs,[15] plaintiff's failure to prove or even assert that the RARDE and Phalanx systems similarly depended upon the sabot patent for success weakens the weight of plaintiff's commercial success argument. Plaintiff made only conclusory assertions that the Phalanx system would have died without the sabot patent. Phalanx comprises electronic spotting, high-density penetrators, rapid-fire cannons, accurate low-elevation tracking, lightweight, high-performance mount, integrated on-mount search track radar, and unitized construction for ease of installation. The closed-loop spotting technique tracks not only the incoming target, but also the projectiles fired by the cannon. The spotter processes the target-projectile miss data to predict a future position of the target and the needed hit trajectory of the projectile. The electronic spotter measures the projectile-to-target miss distance, and automatically closes the target-projectile loop, resulting in an increase in the quantity of rounds concentrated in the target area, and, naturally, in hit probability.

Although defendant admits that the alleged infringing Mark 149 MOD 1 round "is the most effective round presently available for Phalanx system because of the terminal lethality performance of its penetrator," it was not the only sabot that successfully performed in the Phalanx system. To be of value on the issue of obviousness, commercial success must be shown to be attributable to the patentee's claimed contribution, *Jacobson Brothers v. United States*, 206 Ct.Cl. 518, 531–32, 512

F.2d 1065, 1073 (1975), and in some cases must be "tremendous." *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1546 (Fed.Cir.1984). Plaintiff was unable to prove that any commercial success of the Phalanx system conclusively resulted from use of the sabot patent design. In addition, plaintiff admits that the Oerlikon sabot also enjoyed similar commercial success and where the evidence shows that factors other than the claimed invention are highly significant to the success of the allegedly infringing devices, such success has little if any probative value with respect to nonobviousness. *Douglas v. United States*, 206 Ct.Cl. 96, 107, 510 F.2d 364, 370 (1975).

### (2) *Long-felt Need*

Plaintiff contends that from the 1960's until December 1978, the Royal Army Research and Development Establishment (RARDE) tried in vain to develop a small caliber armor piercing discarding sabot (APDS) and that in 1978, over two other options, RARDE chose to license plaintiff's British Patent equivalent to the sabot patent for the RARDE system. On its face, this testimony supports nonobviousness. This court, however, gives this testimony for plaintiff lesser weight than plaintiff would command. RARDE was to design a family of ammunition, not just a small caliber APDS. RARDE's resolved need was not as great as plaintiff would have this court believe. Furthermore, plaintiff relied principally upon the testimony of a Mr. Topping who at the time in question was not, to the satisfaction of the court, one of ordinary skill in the art. Plaintiff maintains that RARDE certainly consisted of engineers with at least ordinary skill in the relevant art. Yet, the primary testimony relied upon by plaintiff for convincing evidence came from a relative newcomer to the art.[16] This rebuts the presumption of

**15.** A showing of commercial success is relevant in resolving the issue of nonobviousness no matter what country the success occurs in. *Lindemann Maschinenfabrik GmbH v. American*

*Hoist & Derrick Co.*, 730 F.2d 1452, 1461 (Fed. Cir.1984).

**16.** Mr. Topping came to the RARDE program in the summer of 1978 without APDS background.

the expertise of RARDE concerning obviousness. Because personnel such as Mr. Topping were making technical decisions, the court nominally weighs plaintiff's evidence in the matter. This court does not herewith say that Mr. Topping's testimony is without merit, but plaintiff's argument is significantly weakened by the obviousness analysis. Accordingly, the nexus between the RARDE need and the merits of the claimed sabot invention is substantially lessened.

In sum, the sabot patent is invalidated for obviousness because plaintiff could not rebut defendant's clear and convincing showing that the prior art devices possessed the claimed invention. *See In re Thorpe,* 777 F.2d 695 (Fed.Cir.1985). Plaintiff also failed to carry its burden regarding secondary considerations. As a result, defendant's showings of obviousness remains intact. *See Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

### 2. *Obviousness Analysis of the Band Patent*

The court notes that it can only consider those facts presented to it by the parties. In the case of obviousness of the band patent, the parties offered much less testimony and evidence. Nevertheless, this court examined the breadth of the claims and the challenge of invalidity to the band patent.

Claim 1 comprises a projectile with a circumferential groove about its base. The groove is recessed below the surface of the projectile and has a generally cylindrical cross-section. A plastic band is located in the groove and extends above the body of the projectile in order to engage the rifling of the gun barrel when transversing it in order to transmit spin to the projectile during launch. A cross-section of the groove reveals dovetailed fore and aft shoulder portions defining the sides of the groove. The generally cylindrical cross-section of

the groove has a smooth aft surface covering approximately one half of the section base, a knurled portion located forwardly of the mentioned aft surface, and a shorter smooth surface located still forward of the knurled surface. Claim 2 incorporates claim 1 but particularizes the use of injection molded bands to achieve the objectives of the patent.

■ Defendant asserts that United States Patent No. 3,496,869 issued to Engel February 24, 1970 (Engel '869), in conjunction with other prior art sufficiently taught and suggested to those of ordinary skill in the art the art of claim 1, and that claim 1 should be invalidated for obviousness. 35 U.S.C. § 103 (1982). The court disagrees for the following reasons.

Defendant asserts that Engel '869 invalidates plaintiff's band patent. Engel '869 teaches a rotating projectile having a recessed circumferential groove containing a plastic band whose outside diameter is larger than the projectile, thereby engaging the barrel's rifling and ensuring transmission of spin to the projectile by the workings of a knurled surface in the groove on the inside of the band. Engel '869 does not, however, teach of any smooth sealing surfaces, their location with respect to the knurled surface, or the significance of the size of the sealing surfaces.

Defendant also asserts that the teachings of the Franklin Institute Report (FIR) and U.S. Patent No. 2,996,012 issued to Butler August 15, 1961 (Butler '012) teach of the significance of dovetailed fore and aft ends in conjunction with a knurled surface between them, and that in conjunction with Engel '869, the advantages of and the configuration of the band patent would have been obvious to one of ordinary skill in the art. The court notes, however, that although FIR Figure 3–1 and Butler '012 clearly teach the use of dual dovetailing, the references neither address nor suggest the significance of a longer smooth surface

By December 1978, he was making APDS procurement recommendations to his RARDE superiors.

operating to seal gas pressure. Claim 1 as a whole is a novel configuration apprehending the interaction of elasticity, pressure, surface tension, and confinement to achieve a superior obturating band that is functional, easily manufactured, lightweight and barrel friendly. Therefore, the court is left to conclude that nothing in the prior art referenced as a whole suggests the desirability and obviousness of making the band patent. *See EWP Corp. v. Reliance Universal, Inc.,* 755 F.2d 898, 907 (Fed.Cir. 1985).

Furthermore, defendant's assertion that claim 1 does not embrace the novel sealing effect to overcome prior art because claim 1 does not encompass injection molding must fail. The court is free to examine the specifications in order to clarify the claims and understand the context in which the claims operate. In this case, the band patent expressly sets forth the sealing effect of the longer smooth surface without restricting its application to the use of injection molding. Band patent, col. 3, lines 54–59, col. 4, lines 6–14. In addition, this court rejects defendant's attempt to discredit the band patent's sealing effectiveness by post-firing measurements obtained after sawing and examining the projectile bases. The state of the projectile base and band, when cut, are too far removed from their operational state to allow any credible measurements of significant weight.

■ Like claim 1, claim 2 is not within the teaching of the prior art so far as obviousness is concerned. Defendant contends that plaintiff's band does not and cannot operate as claimed. None of the references cited by defendant address the interaction of the longer smooth surface with the properties of injection molding. This court is not willing, on the evidence presented in this case, to declare the sealing operation of the band patent to be a method yielding unattainable ends or an untenable method to an end. On the contrary, the court finds that the injection molded band was functional and within the norms of established principles of the art at the time.

Claim 5 also incorporates claim 1 but further particularizes the injection molded band to comprise a band of polycarbonate. Claims 6 and 7 incorporate claim 1 and particularize the range of plastics covered by the band patent configuration. Claims 5 through 7 are not invalidated for obviousness for the same reasons explained with respect to claim 1. These claims merely claim the bounds of the plastics best suited to the configuration of claim 1. Thus, the band patent is deemed valid and enforceable by the court.

3. *Obviousness Analysis of the Slot Patent*

■ A person of ordinary skill in slot art is the same type of person discussed under the sabot patent. This entire area of sabot science is not garden-variety tinkering. One of ordinary skill in the art would have apprised himself of the relevant art in the PTO. The court concludes that one of ordinary skill in this art would have known or should have known of the disclosures contained in the easily accessible references cited and not cited by the PTO. At the time, a person interested in the optimization of discarding sabot performance knew of the necessity of low energy loss during sabot separation, the necessity of a high coefficient of friction between the sabot and core in order to transmit maximum spin to the core, that knurling, whether large or small, deep or shallow provided such friction, the existence of setback forces resultant to instantaneous acceleration, and the characteristic effect of such forces on softer surfaces acted upon by harder knurled surfaces. These basic principles of launch and the reaction of adjacent surfaces to the extremes of launch would have been a must for one of ordinary skill in the art at the time the slot patent was developed.

Plaintiff attempts to distinguish the knurling pattern in the base of Dunlap '720 cited by defendant, from the claimed single slot of the slot patent. According to plaintiff, the single slot art permits simpler, more economical and less hazardous manu-

facture when the requisite core is made of material like dU. Plaintiff relies heavily upon this argument, but mention of such advantages is made only generally and without any particularity in the slot patent, and appears to this court to be more of an afterthought. An alleged essential feature or vital contribution to the art cannot be urged to support validity when it is not expressly referred to as such in the specification nor specifically covered by the claims. *Douglas v. United States*, 206 Ct.Cl. 96, 105–06, 510 F.2d 364, 368–69 (1975). The slot patent directs particular discussion to neither the necessity of a sharp-edged groove, nor the necessity or significance of the vertical angle of the slot's standing sides. Without any reason for this court to distinguish between knurling and a slot, the court concludes that one of ordinary skill in the art knew of the relatively similar operative effect of knurling and a slot of any length, width or depth. The slot patent specifications and claims are silent as to the significance of any such parameter.

In addition, the slot patent's claiming of "a slot" is found in Dunlap '720. The court concludes that in this art, a slot is a groove, and a knurled surface is a series of slots or grooves side-by-side. It is irrelevant that there is a second slot next to the first, a third next to the second, and so on. Plaintiff is estopped from claiming that the slot patent permits only one slot or groove in the penetrator. Both the sabot and the slot patents state that one embodiment of the base of the core may have a "series of grooves in the base of the subcaliber core." Sabot patent, col. 5, lines 45–46; slot patent, col. 5, lines 45–46. The court concludes that the reduction in the number or configurations of grooves or slots is not a key to success and advancement in the art and would have been obvious to one of ordinary skill in the art at the time the invention was made.

Furthermore, Dunlap '720 was comprehensive in its teaching of engraving a harder metal into a softer one. Dunlap '720 teaches:

Either the front surface of the sabot [recess] or a rear surface of the projectile core may be knurled so as to take advantage of the force of the set back when the projectile is fired. The unknurled surface may be slightly softer than the knurled surface so as to be engraved by the knurled surface when set back forces the two surfaces together.

Dunlap '720, col. 1, lines 43–49; col. 3, lines 37–50; col. 4, lines 16–25.

In the absence of any persuasive argument regarding significant commercial success, long-felt and unresolved need, or the failure of others to remedy the need, this court concludes that the evidence overwhelmingly supports defendant's argument that the slot patent should be invalidated for obviousness under 35 U.S.C. § 103 (1982).

## II. *Infringement*

Even though this court's determination of invalidity of plaintiff's three patents moots allegations of infringement, it is proper for this fact-finding court to decide validity *and* infringement and to enter a judgment as to both issues since both were raised in this suit. *Simmons Fastener Corp. v. Illinois Tool Works, Inc.*, 739 F.2d 1573, 1576 (Fed.Cir.1984).

Whoever makes, uses, or sells any patented invention, without the authority of the patentee within the United States during the term of the patent, infringes the patent. 35 U.S.C. § 271 (1982). The issue of infringement raises at least two questions: 1) what is the scope of the patented invention, and 2) has what is patented been improperly made, used or sold by another. The first inquiry is a question of law, the second is a question of fact. *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569 (Fed.Cir.1983).

Infringement is either literal infringement or infringement under the doctrine of equivalents. Literal infringement means that that a claim reads on a device. A claim reads on a device when everything in the claim appears in the device. It does

not matter that other elements or structures appear in the device that are not found in the claim. If a claim reads upon a device, then there is literal infringement of that claim by the device.

▮▮▮▮ The doctrine of equivalents comes into play only when there is no literal infringement. *Seattle Box Co. v. Industrial Crating & Packing, Inc.*, 731 F.2d 818, 828 (Fed.Cir.1984). The doctrine of equivalents permits a finding of infringement when, even though a claim is not literally infringed, the infringing device, process, or composition of matter uses substantially the same means in substantially the same way to obtain substantially the same result. *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). Equivalents is designed to protect the inventor from unscrupulous copyists and to avoid the necessity for an inventor being required to predict all future developments which would enable the practice of his invention in substantially the same way. *Kinzenbaw v. Deere & Co.*, 741 F.2d 383, 389 (Fed.Cir.1984).

▮▮▮▮ Equivalency extends the breadth of claims beyond express terms to encompass any element which one of ordinary skill in the art would perceive as interchangeable with the claimed element. *Thomas & Betts Corp. v. Litton Systems, Inc.*, 720 F.2d 1572, 1579 (Fed.Cir.1983). A pioneer invention is entitled to a broad range of equivalents, whereas an invention representing only a modest advance over the prior art is given a more restricted range of equivalents. *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1362 (Fed.Cir.1983). If equivalents appears, infringement will be found unless 1) the applicant's arguments or amendments during prosecution estop the patentee from asserting a range of equivalents broad enough to encompass the accused products or process, or 2) the equivalent device is within the public domain, *i.e.*, found in prior art. Finding 1) or 2) does not effect validity. *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 900 (Fed.Cir.1984).

## A. *Infringement of the Sabot Patent*

### 1. *Scope of the Sabot Patent Claims*

The plaintiff's patented sabot is comprised of a subcaliber core, a full-caliber sabot base having a member or means or recess for receiving the core, means for imparting rotation to the projectile during traverse of a gun barrel, a sabot covering the subcaliber core, a sabot having a forward body portion for covering the forward portion of the core, a plurality of body segments secured to the forward body portion and extending rearwardly from the forward body portion in covering relationship to the core, said body segments being defined by areas of weakness or recesses or radially spaced slots extending longitudinally of the sabot, said body segments being secured to the base, means for holding the forward portion of the body segments in fixed relation to each other as the projectile spins when fired, and second means for holding the rear body portion of the body segment in fixed relation to each other. The only real contention is the uniqueness of the operation features of the claimed improvement and the allegedly infringing devices, *i.e.*, that the sabot petals initially fracture along the zones of predefined weakness at the rear of the sabot body, and that the fracturing progresses forward while the front portion of the petal segments are retained solid, and that the progress fracturing is the result of a combination of centrifugal forces and the impinging gases of the projectile's propellant as it issues from the muzzle.

### a. *Claim Construction—Claim Language*

In order for this court to properly determine the scope of the claims and whether they were infringed, this court must properly construe the claims, the specifications, and the prosecution history.

▮▮▮▮ The Federal Circuit, sitting *en banc*, reviewed the process of claim interpretation and stated:

A claim is construed in the light of the claim language, the other claims, the prior art, the prosecution history, and the specification, *not* in light of the accused device.... It is only *after* the claims have been *construed without reference to the accused device* that the claims, as so construed, are applied to the accused device to determine infringement.

*SRI International v. Matsushita Electric Corp. of America*, 775 F.2d 1107, 1118 (Fed.Cir.1985) (emphasis in original). A court should first resort to the words of the claims, which define the metes and bounds of the invention, giving words their ordinary and accustomed meanings, unless it appears that the inventor used the words differently, which he may. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed.Cir.1984).

 Although claims 2–7 expressly claim a discarding sabot[17] that initially fractures at the rear, with fracturing and removal of the sabot body segments progressing toward the front, claim 1 does not. This court may not introduce into a claim limitations which are explicitly contained in other claims. *Caterpillar Tractor Co. v. Berco, S.p.A.*, 714 F.2d 1110, 1116 (Fed.Cir. 1983). Claim 1 states, as do claims 2–7, that the sabot petals are removed from around the core by centrifugal forces and forces from the impinging propellant gases in a reverse gas flow. It is the determination of this court that, in light of the express language of claims 2–7, claim 1 does not claim a sabot initially opening at the rear. *See id.* This conclusion is fortified by the prior art which also teaches of the combination of centrifugal and propellant forces discarding the sabot body without requiring the sabot petals to first open at the rear. Brandt '604; Allom '808.

b. *Claim Construction—Specification Contribution*

 Though claims generally are to be read in light of the specification, the sabot

patent claims are not limited to preferred embodiments and the specification. *See Lemelson v. United States*, 752 F.2d 1538, 1549 (Fed.Cir.1985). Claims and their terms are best construed in light of the specification and circumstances surrounding the patent at its inception. The specification demonstrates the claims' theory of operation, function, and advantages of the device. The specification sets forth known or best known embodiments of the invention. Claims should not be limited to *preferred* embodiments or specific examples in the specification, and if the specification does not require such a limitation, it should not be read into the claim.

In this way, the sabot patent claims are not limited to projectiles stabilized by spin only because the sabot patent claims also read on devices which would be comprised of, at its narrowest, a subcaliber core having a conical front body section and a generally cylindrical rear body portion. Sabot patent, col. 10, lines 24–26. But even this interpretation could encompass discarding sabots stabilized aerodynamically by fins or flares. *See* Sabot patent, col. 8, lines 43–46.

c. *Claim Construction—Prosecution History (File Wrapper)*

 Prosecutorial history estoppel comes into play solely in opposition to a patentee's attempt to use the doctrine of equivalents to expand the literal claim language to cover an allegedly infringing device. Where equivalency broadens a claim's scope, prosecution history holds the patentee to a narrow interpretation of his claim as a result of his having amended the claim to avoid a prior art rejection during prosecution, *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1363 (Fed.Cir. 1983), whether the examiner was right or wrong. *Exhibit Supply Co. v. Ace Patents Corp.*, 315 U.S. 126, 137, 62 S.Ct. 513, 519, 86 L.Ed. 736 (1942).

17. Plaintiff claims that the sabot patent discloses a sabot offering improved performance because the sabot body initially opens at the rear. Thus under the influence of centrifugal force and propellant gases, core yaw and dispersion is minimized.

■ The prosecution history of the sabot patent supports this court's determination that claim 1 does not claim a discarding sabot that initially separates at the rear. During a February 17, 1972 interview with the patent examiner, plaintiff's counsel was encouraged to limit the claims to claims "which define the sabot body segments as initially opening at the rear portion of the sabot while remaining secured to the forward body portion of the sabot, thus presenting a rearwardly separating sabot which is exposed to muzzle gases for the purpose of separating the sabot from the core." Prosecution History at 99. Plaintiff's arguments or amendments during prosecution estop him from asserting a range of equivalents broader than claimed. *See id.*

## B. *Infringement Analysis of the Sabot Patent*

Plaintiff has the burden of proving by a preponderance of the evidence that the contract sabots and the test sabots infringe the sabot patent. *See Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 758 (Fed.Cir. 1984).

### 1. *Contract Sabots*

■ Infringement of the sabot patent requires that the fracture and separation of the sabot body initiate at the rear of the sabot body and progress to the front as a result of centrifugal force and propellant gases. Defendant maintains that plaintiff's and defendant's testimony established that upon exit from the barrel, some sabot noses had already opened, proving that the sabot had not initially opened at the rear. The court does not accept this argument. None of the claims of the sabot patent limits the point in the ballistics cycle at which the fracture of the sabot takes place. The illustrative embodiments and the specifications state that the fracture and separation occur immediately upon exit of the sabot body from the muzzle, though it may occur within the barrel as well, as the sabot patent design may permit.

It is the finding of this court that the sabot used by the Navy literally infringes claims 1–7 of the sabot patent because the claims clearly read on the devices. Plaintiff proved the above enumerated infringement by a preponderance of the evidence.

### 2. *Test Sabots*

■ Plaintiff, however, was unable to show by a preponderance of the evidence that the test sabot (which only has part of a forwardly extending sabot body, thus leaving the penetrator tip exposed) either literally or under the doctrine of equivalents infringed claims 1–7. Plaintiff merely makes conclusory statements regarding the operation and design of the test sabot without offering evidence to prove the infringement of the test sabot.

All the sabot patent claims require the sabot body segments to cover the core. Yet, neither the claims nor the specifications expressly define this phrase or element of the patent. The court concludes that an interpretation of the sabot patent as a whole does not permit the sabot patent claims to be read on the Navy test sabots.

It is not inconsistent for the court to consider the prior art of test-like sabots for claim invalidity purposes, yet deny expanding the reach of the same claims to include test sabots for purposes of infringement. The claims are the metes and bounds of the invention. The sabot patent specifications teach away from a test sabot, which only has part of a forwardly extending sabot body. Thus the penetrator tip is left exposed.

The sabot invention is to function in extreme conditions from −65° to 125°F in wet, dry or dirty environments. This "wide variety of environmental conditions" is not test-sabot-friendly. The specifications indicate that the nose of the penetrator is indeed to be enclosed. Sabot patent, col. 4, line 29; col. 5, lines 4–9. Furthermore, the test sabot, which is usually used for experimentation and test firing, is not compatible to the automatic capability of the invention claimed in the sabot patent. Sabot patent, col. 5, line 9.

The test sabot designed and used by the Navy was sufficiently different in its structural embodiment from the test sabot invented and patented by plaintiff that this court is unable to find infringement of claims 2–7. For example, plaintiff contends that the Navy test sabot design was the design contained in Navy drawings 746, sheets 1 to 3. This is correct. Plaintiff then asserts that the test sabot infringes claims 4–6, which expressly require a recess that the core is received. The Navy design has no recess whatsoever. Moreover, the flat contact surface between the core and the base may well have advantages above plaintiff's recess.[18]

This court finds that plaintiff was unable to prove by a preponderance of the evidence that the test sabots literally or under the doctrine of equivalents infringed claims 1–7 of the sabot patent.

### C. *Infringement of the Band Patent*

Defendant concedes infringement of claims 1, 2, 5, 6 and 7 if the claims are held valid and enforceable. Defendant denies infringement of claim 7 when Nylon 6/6 is employed as the band material in its sabots. Plaintiff concedes this point to defendant. Yet, in light of this court's conclusion of invalidity, there is no infringement.

### D. *Infringement of the Slot Patent*

Defendant concedes infringement of the slot patent if it is valid, enforceable and not owned by or otherwise licensed to defendant. Notwithstanding the court's conclu-

sion of invalidity, there would be literal infringement of the slot patent.

### III. *Defendant's Rights of Title or License to Plaintiff's Patented Art*

■ When an invention is developed within the course of a government contract, it is enough to grant the government license to use the invention if a significant feature of the invention resulted from the contract performance. *Technical Development Corp. v. United States*, 220 Ct.Cl. 128, 149–50, 597 F.2d 733, 745 (1979). Plaintiff contends that the research and development of all three patents were independent of the plaintiff's performance under the projectile and penetrator government contracts. In accordance with the provision on title to patent rights in the government contracts, defendant claims a license to make, use, and sell all three of the plaintiff's potential inventions because the inventions were not fit for successful incorporation into Phalanx until some time after the plaintiff began performance under the government contracts. Thus, the controlling issue is whether a "significant feature" of the three inventions "resulted directly from the course" of the plaintiff's projectile contract with the Army, or the plaintiff's penetrator contract with the Navy.

### A. *Defendant's License to the Sabot Patent Under the Army's Projectile Contract with the Army*

■ Plaintiff claims that the sabot patent is valid and infringed by defendant because prior to the November 9, 1967 contract date, plaintiff had conceived and re-

---

**18.** In addition, the court notes that plaintiff's reliance upon the web stress formula on page 15 of its September 14, 1984 EVALUATION OF THE MK 149 MOD 1 SABOT SEPARATION DYNAMICS further weakens its argument that the test sabot infringes claims 2–7 of the sabot patent. In the web stress formula $\rho$, w and $r_2$ are relative constants.

$$\sigma_{web} = \frac{\rho w^2}{3} \frac{(r_2^3 - r_1^3)}{(r_0 - r_1)}$$

$\sigma$ is the density of the sabot material, w is the spin rate of the projectile, $r_1$ is the inside radius of the sabot body at the web point of interest, $r_0$ is the centroid radius of the sabot body at the web point of interest, and $r_2$ is the exterior radius of the sabot body at the web point of interest. In this case $r_1$ of the front of the sabot is smaller than $r_1$ of the back of the sabot, and even if by conservative calculation $r_0$ was the same for front and back—which it would not be, that is, $r_0$–front would be less than $r_0$–back— $\sigma$ web for the front is decisively larger than $\sigma$ web for the back.

duced to practice a device claimed by the sabot patent.[19] Plaintiff also contends that during the time of the projectile contract, plaintiff continued its research and development of its patented spin-stabilized sabot entirely independent of the research done on the fin-stabilized sabot. Plaintiff contends that it was able to successfully keep its fin-stabilized sabot project and its spin-stabilized sabot project legally separate and that there was no connection between the two contemporaneous projects. Plaintiff contends that after the fin-stabilized sabot work was completed, plaintiff continued to develop the spin-stabilized sabot, which thereafter led to the filing of Patent Application No. 854,095 on August 29, 1969. The spin-stabilized sabot patent issued February 6, 1973 to Feldmann and was assigned to plaintiff. Plaintiff contends that the defendant's unauthorized use and sale of contract sabots infringe the sabot patent.

Defendant contends that the sabot patent is invalid and not infringed. In the alternative, defendant maintains that plaintiff first conceived and actually reduced its spin-stabilized sabot to practice under the projectile contract, thus giving defendant title or license for its contribution to the advancement of this area of discarding sabot technology.

The contention regarding defendant's title or license to the sabot patent turns primarily upon Article 96 of the projectile contract entitled "Patent Rights (Title) (Oct. 1966)." Defendant relies upon subsections (a) and (b). Subsection (b) addresses defendant's claim to title in the patented technology. It reads: "the Contractor agrees to grant the government all right, title and interest in and to each Subject Invention (made by the Contractor)." Section (a) defines Subject Invention as "any invention or discovery, whether or not patentable, conceived or first actually reduced to practice in the course of or under this contract." The term "Subject Invention" includes the "manufacture, design or composition of matter, or any new and useful improvement thereof."

The express language of the projectile contract contracted plaintiff "to develop and test a pre-production prototype model of an armor piercing projectile which is compatible with the HS–820 20mm gun system and which will be capable of defeating the armored targets specified for the Interim Vehicular Rapid Fire Weapon System." Plaintiff's Exhibit No. 70, p. 5. The proposal was to encompass tasks including system design and performance analysis, detailed design, development engineering, reliability program, documentation, and monthly progress reports. The express language of the projectile contract refers to neither the fin-stabilized sabot or the spin-stabilized sabot. Plaintiff maintains that the contractual intent was to encompass fin-stabilized sabot development only, whereas defendant asserts an intention that would also include the admittedly applicable spin-stabilized sabot technology.

Both parties agree that the contract was primarily to design a fin-stabilized sabot. Yet, trial testimony makes clear that it was the intent of both parties that the army was not contracting for a compatible fin-stabilized sabot only, but also for new and

**19.** In late 1966, Lynch was serving as the project manager for the army's vehicle rapid fire weapon system (VRFWS). At that time, the army sought to develop Interim and its successor the Bushmaster to fulfill the army's needs under VRFWS. The army was interested in ammunition that had effective behind-armor target defeat capabilities. Lynch learned that Feldmann had been studying the use of dU for armor piercing projectiles.

Lynch first contacted Feldmann in December 1966 to pursue the development of dU armor piercing ammunition for the VRFWS. In March 1967, Lynch requested Feldmann to sub-

mit an unofficial proposal for the development of discarding sabot ammunition compatible with the 20mm H.S. 820 gun which the army had selected for the VRFWS project. Plaintiff submitted a proposal advising the research and development of both spin-stabilized and fin-stabilized discarding sabot projectiles. The army decided to center its research and development around the fin-stabilized sabot; favoring fin-stabilized long rod sabots over spin-stabilized sabots because of their theoretically better armor penetration. A cost-plus fixed-fee contract for the projectile was signed by plaintiff and the army on November 9, 1967.

advanced technology exploration, such as would be useful for the Bushmaster. Plaintiff offered no evidence of written amendments to the projectile contract to rebut the proof of amendments proffered by defendant, which shows that the projectile contract encompassed more than fin-stabilized sabot alone. Furthermore, the monthly reports submitted by plaintiff to defendant indicate that the projectile contract was not narrowly limited to only fin-stabilized sabot research and application.

Defendant's amendments to the contract evidence an agreement to develop and test spin-stabilized sabots and perform research and development, which plaintiff admits is applicable to both fin-stabilized sabots and spin-stabilized sabots. In the sabot patent specifications, plaintiff claims that "one may utilize the same discarding sabot principle in connection with other types of projectiles such as high explosives, single flechette, multiple flechette, *or the like*," Sabot patent, col. 8, lines 43–46 (emphasis added). The specification states:

Accordingly, in view of the *wide applicability* of the principles herein disclosed, I do not wish to be limited to the particular designs and embodiment herein disclosed. It therefore should be understood that other adaptations of my invention are intended to be comprehended within the meaning and range of the ... claims.

Sabot patent, col. 8, lines 47–53 (emphasis added).

This echoes the statement made by Feldmann in an October 4, 1968 report entitled "PACIFIC TECHNICA CORPORATION SPIN STABILIZED, DISCARDING SABOT AMMUNITION" (October 4th Report). Plaintiff describes how its new spin-stabilized sabot is superior to the existing spin-stabilized sabots. October 4th Report at 57051. Plaintiff proclaims that the "discarding sabot principle as described above is applicable for either spin or aerodynamically stabilized projectiles." *Id.* at 57053, 57057. These statements were made during the projectile contract.

The monthly reports are the best indication of what occurred under the projectile contract. Plaintiff contends that the work performed under the projectile contract had application to fin-stabilized sabots only. However, the evidence presented at trial conclusively establishes that substantial effort was directed toward the design and testing of spin-stabilized sabots.

In addition, the court finds that plaintiff's alleged novel rear opening invention is equally applicable to fin-stabilized sabots and spin-stabilized sabots, which means that plaintiff developed technology applicable to either both fin-stabilized sabots and spin-stabilized sabots or neither. This court finds that the scope of the projectile contract was not limited merely to research and development of fin-stabilized sabot technology, but that its breadth encompassed scientific exploration and applied science reaching similar principles of ballistics incorporated in spin-stabilized sabot art development.

Contrary to plaintiff's claim that the projectile contract covered principally the development of fin-stabilized sabot and its respective penetrator, significant research and development was devoted to sabot development as well. Several monthly reports indicate that little or no research regarding the dU penetrator itself had been done during certain periods of time, but that the emphasis of the research had been directed toward sabot dynamics and design. Monthly Report No. 6 at 2; Monthly Report No. 8 at 8; Monthly Report No. 9 at iii, 8, 9, 11, 12, 14–18. It is a finding of this court that it is not possible to draw a line as to where fin-stabilized sabot art stops and spin-stabilized sabot art begins; research and development of either one is beneficial and useful to the other.

The only evidence that plaintiff offered to disprove this was its log sheets that indicate the expenditures made by plaintiff during the projectile contract. Plaintiff maintained that all expenditures relating to the projectile contract were made under its internal account no. 37 and that all expenditures made for plaintiff's allegedly independent spin-stabilized sabot project were made under account no. 34. Plaintiff asserts that it made a conscious effort to

segregate all of its costs and to charge pertinent costs to the respective job number. Plaintiffs assertion that the periodic and final audits by defendant auditors of plaintiff's records and accounting procedures confirms the legal independence of its fin-stabilized sabot and spin-stabilized sabot projects. However, plaintiff has not refuted the defendant's clear showing that plaintiff's personnel performed significant development and refinement of spin-stabilized sabot design while charging the work hours to the account set aside for fin-stabilized sabot work. This court recognizes that plaintiff's records, kept in the ordinary course of business, are reliable because the company relies upon them for their day-to-day business. Fed.Rule of Evidence 802(6). Yet, the court also recognizes the insufficiency of plaintiff's records to refute doing spin-stabilized sabot work and charging it to the projectile contract. This does not overcome defendant's showing that many spin-stabilized sabot work hours went unreported when spin-stabilized sabot work was documented, while only fin-stabilized sabot hours under the projectile contract were billed. If spin-stabilized sabot hours were worked, they should have been reported. Thus, under the same reliability of Rule 803(6), the failure of a record to mention a matter which would normally be mentioned is sufficient evidence of its nonoccurrence. Fed.R.Evid. 803(7). Any contention by plaintiff that such hours were not ordinarily recorded would show a lack of conscious effort to keep plaintiff's accounts separate.

Plaintiff's performance of spin-stabilized sabot work under the projectile contract led to reduction to practice of the sabot patent.[20] The court finds that government funds were used in the development and significant improvement of sabot art applicable to the defendant's use of spin-stabilized sabot technology. The court agrees with *Technical Development Corp. v. United States,* 220 Ct.Cl. 128, 597 F.2d 733 (1979) that "it is enough that a significant feature of the invention was itself, within the contractual scope, or resulted directly from the course of the contract performance." *Id.,* 220 Ct.Cl. at 149, 597 F.2d at 745 (citing *Mine Safety Appliances Co. v. United States,* 176 Ct.Cl. 777, 787–88, 364 F.2d 385, 391 (1966)). Significant and essential features from the sabot design of the sabot patent were first actually reduced to practice under the projectile contract. The defendant has the right to use, royalty-free those inventions which have a "close and umbilical relationship" to the work and research funded by the United States and crystalized during performance of a federal contract. *Technical Development,* 220 Ct.Cl. at 150, 597 F.2d at 745. As a contributor to the advancement of the art, defendant has title to the sabot invention. However, this title would be strictly limited to the 20mm spin-stabilized sabot that is compatible with the Phalanx system if the sabot patent were not invalidated.

**B.** *Defendant's License to Plaintiff's Band Patent Under the Navy's Penetrator Contract*

Plaintiff recognizes without contention that the GD purchase order, under which

20. The court notes that service condition tests have been required whenever the conditions in actual use have not been duplicated in the laboratory before actual reduction to practice of the device in question is completed. *Farrand Optical Co. v. United States,* 325 F.2d 328, 331–32 (2d Cir.1963). Judge Learned Hand stated in *Sinko Tool & Manufacturing Co. v. Automatic Devices Corp.,* 157 F.2d 974 (2d Cir.1946) that "a test under service conditions is necessary in those cases, and in those only, in which persons qualified in the art would require such a test before they are willing to manufacture and sell the invention, as it stands." *Id.* at 977. The projectile contract called for the development and testing of a pre-production prototype model of

an armor piercing projectile which is compatible with the H.S. 820 and which will be able to defeat the armored targets specified in VRFWS. Admittedly, the reduction test is not one of flawlessness, but is one of a showing that "the invention would work as intended in its contemplated use." *Eastern Rotorcraft Corp. v. United States,* 181 Ct.Cl. 299, 302, 384 F.2d 429, 431 (1967). Plaintiff's development and testing simply did not begin to simulate the characteristics and environment of a full scale, operative Phalanx device in its practical, contemplated setting before contracting with the government. *See Technical Development v. United States,* 220 Ct.Cl. 128, 153, 597 F.2d 733, 747–48 (1979).

plaintiff provided the performance offered in plaintiff's TP–118–70 proposal, was a subcontract of the penetrator contract. The penetrator contract, like the projectile contract, had a patent rights provision defining the rights of the parties. Section J–22(g) of the penetrator contract provides that "[t]he Contractor shall, unless otherwise authorized or directed by the Contracting Officer, include a patent rights clause containing all of the provisions of this Patent Rights clause." Therefore, a "[sub]contractor agrees to and does hereby grant to the Government an irrevocable, nonexclusive, and royalty-free license to practice and have practiced each [invention, discovery or new and useful improvement] acquired by or for the Government or with funds ... derived through the Government." Penetrator contract, J–22(b).

■■■ Any incorporation of the band patent art into the work done under the penetrator contract did not involve the type of improvement, redesign, or modification required for compatible sabot operation to give defendant royalty-free use of the sabot patent under the projectile contract. The court has already found that the band patent was sufficiently reduced to practice before the penetrator contract with an eye towards its use in VRFWS. Defendant does not even make a persuasive *prima facie* showing that the band patent was actually reduced to practice during the course of the penetrator contract. The court therefore finds that defendant does not have a license to the band patent under the penetrator contract.

C. *Defendant's License to Plaintiff's Slot Patent Under The Navy's Penetrator Contractor*

■■■ The issue in the instant matter is not whether plaintiff is entitled to the earlier filing date of the sabot patent for the slot patent invention, but whether and when the slot patent invention, for purposes of licensing under defendant's contract, was actually reduced to practice.

The license provision of the penetrator contract, discussed previously with respect to the band patent, also applies to the slot patent. The penetrator contract lays claim under its patent rights provisions to inventions "first actually reduced to practice in the course of or under this contract." J–22(a). The court recognizes that indeed the slot patent, as a division of the sabot patent, was constructively reduced to practice on August 29, 1969, when the sabot patent was filed. Yet, plaintiff has never attempted to establish a date of actual reduction to practice before the performance of the penetrator contract development work. Actual reduction to practice and constructive reduction to practice have different legal significance. While a constructive reduction to practice may be achieved by the filing of a patent application containing an adequate description of the invention, an invention such as the one in dispute is only actually reduced to practice when it is put into physical form and shown to be operative in the environment of its practical contemplated use. *Technical Development Corp. v. United States,* 202 Ct.Cl. 237, 308 (1973).

Plaintiff's drawing dated October 1971 was submitted to GD under the GD purchase order. The drawings disclose that the optimized penetrator was developed and successfully tested under the GD purchase order. The disclosure includes the slot patent. This is a *prima facie* showing that the slot patent was actually reduced to practice under the penetrator contract and the GD purchase order. The court concludes that under the patent rights of the penetrator contract, defendant has a nonexclusive, royalty-free license to practice the slot patent because plaintiff has not so much as asserted any actual reduction to practice of the claimed slot patent invention prior to the February 1971 signing of the GD purchase order.

CONCLUSION

In summary, claim 1 of the sabot patent (No. 3,714,900) is invalidated for anticipation under 35 U.S.C. § 102(b) (1982). Claims 2–7 are invalidated for obviousness under 35 U.S.C. § 103 (1982). However, the sabot patent would be infringed by

defendant's contract sabots if they were not otherwise invalid, but the test sabots would not infringe. Finally, defendant's title or license to the sabot patent would be limited to the 20 mm spin-stabilized sabot that is compatible with the Phalanx system if the plaintiff's sabot patent were not invalidated.

Band patent (No. 3,786,760) is not invalidated under section 102(a) anticipation or section 103 obviousness, but is invalidated under section 102(b) because it was offered for sale more than one year before the patent application. Defendant would not have a license to practice the band patent if it were valid because defendant did not prove that the patent was reduced to practice during the penetrator contract with the government.

The slot patent (No. 3,847,082) is not anticipated by the prior art, but it is invalidated for obviousness under 35 U.S.C. § 103 (1982). Moreover, defendant has a license to practice the slot patent since the defendant reduced the slot invention to practical operation during the penetrator contract.

The court concludes that the result of the analysis in this Opinion is that defendant is not liable to plaintiff for alleged infringement of the sabot, band, or slot patent. Defendant's counterclaim is granted within the limitations explained under the "Defendant's License to the Sabot Patent" analysis. No amount is due the defendant. The clerk of the court is directed to dismiss the Complaint.

